UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT and HARLENE HOROWITZ, On
Behalf of Themselves and All Others Similarly
Situated,

         Plaintiffs,

      -against-

AMERICAN INTERNATIONAL GROUP,
INC., *et al.*,

         Defendants.

---

ECF CASE
09 CV 7312 (PAC) (THK)

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
51 Madison Avenue - 22nd Floor
New York, New York  10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

*Attorneys For Defendants American International
Group, Inc., American International Insurance
Company of California, Inc., AIU Holdings, Inc.
(Now Known as Chartis Inc.), Chartis Inc., AIG
Private Client Group, AIU Holdings LLC (Also
Known as Chartis International, LLC), AIG
Property Casualty Group, Inc., (Now Known as
Chartis Inc.)*

Of Counsel:
Michael B. Carlinsky
Jane M. Byrne

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 4

    A.    The Madoff Ponzi Scheme ........................................................................... 4

    B.    Madoff's Investment Advisory Company Has Long Been Insolvent ................... 6

    C.    The Policy .................................................................................................. 6

    D.    Plaintiffs' Insurance Claim .......................................................................... 7

PROCEDURAL HISTORY ...................................................................................................... 8

    A.    The Original Complaint ............................................................................... 8

    B.    Plaintiffs' Second Effort To Plead Viable Claims ........................................... 9

    C.    Rather Than Respond To Defendants' Proposed Motion To Dismiss,
          Plaintiffs Make A Third Attempt To Plead Viable Claims ............................... 9

ARGUMENT ...................................................................................................................... 11

I.      PLAINTIFFS' CANNOT STATE A BREACH OF CONTRACT OR
       DECLARATORY RELIEF CLAIM BECAUSE THEY HAVE FAILED TO
       ALLEGE FACTS GIVING RISE TO A "LOSS" INSURED UNDER THE
       POLICY .................................................................................................... 12

    A.    Plaintiffs Cannot Allege Either A Loss Or One That Is The Direct Result
          Of The Madoff Fraud ................................................................................ 14

    B.    Plaintiffs' Claim Falls Within The Express Language Of The Policy
          Exclusions ................................................................................................ 17

    C.    Plaintiffs Fail To Allege That They "Parted With Something Of Value" ........... 18

    D.    Plaintiffs Do Not Have An Insurable Interest Required To Bring A Claim ........ 19

    E.    Plaintiffs Fail To Allege That They Invested During the Alleged "Pre-
          Ponzi" Period Or That Some Of The Fictitious Profits Were Attributable
          To Securities Purchased During The Policy Period ........................................ 20

II.     PLAINTIFFS' CLAIM FOR BREACH OF THE COVENANT OF GOOD
        FAITH AND FAIR DEALING SHOULD BE DISMISSED AS A MATTER OF
        LAW BECAUSE THERE WAS NO BREACH OF CONTRACT .................................22

III.    PLAINTIFFS' CAUSE OF ACTION FOR UNJUST ENRICHMENT FAILS AS
        A MATTER OF LAW.................................................................................................23

IV.     PLAINTIFFS' FOURTH AND SIXTH CAUSES OF ACTION FOR
        DECLARATORY RELIEF SHOULD BE DISMISSED AS REDUNDANT AND
        UNNECESSARY .......................................................................................................23

CONCLUSION....................................................................................................................24

# TABLE OF AUTHORITIES

**Page**

## Cases

*805 Third Ave. Co. v. M.W. Realty Assoc.*,
  58 N.Y.2d 447 (1983)..........................................................................................3, 12

*AIU Ins. Co. v. Superior Court*,
  51 Cal. 3d 807 (1990) ...............................................................................................12

*In re Allstate Ins. Co. (Stolarz)*,
  81 N.Y.2d 219 (1993)................................................................................................12

*Arista Records LLC v. Usenet.com., Inc.*,
  No. 07 Civ. 8822, 2008 WL 4974823 (S.D.N.Y. Nov. 24, 2008) ......................................24

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ......................................................................................... 11, 18

*Auten v. Auten*,
  308 N.Y. 155 (1954)..................................................................................................12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 11, 20

*Blaney v. Int'l Ass'n of Machinists & Aerospace Workers*,
  87 P.3d 757 (Wash. 2004) ..........................................................................................18

*Cantor v. Am. Banknote Corp.*,
  No. 06 Civ. 1392(PAC), 2007 WL 3084966 (S.D.N.Y. Oct. 22, 2007) ............................4, 5

*Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co.*,
  No. CV305-167, 2007 WL 4973847 (S.D. Ga. Sept. 14, 2007)....................................2, 16

*Clark-Fitzpatrick, Inc. v. Long Island R.R.. Co.*,
  70 N.Y.2d 382 (1987)................................................................................................23

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d  42 (2d Cir. 1991) ........................................................................................11

*Dinosaur Dev., Inc. v. White*,
  216 Cal. App. 3d 1310 (1st Dist. 1989).........................................................................23

*Everhart v. Drake Mgmt., Inc.*,
  627 F.2d 686 (5th Cir. 1980) ......................................................................................16

*FDIC v. United Pac. Ins. Co.*,
  20 F.3d 1070 (10th Cir. 1994) ....................................................................................16

*Fasolino Foods Co. v. Banca Nazionale del Lavoro*,
  961 F.2d 1052 (2d Cir. 1992).....................................................................................22

*Fid. & Dep. Co. of Md. v. Usaform Hail Pool, Inc.*,
 463 F.2d 4 (5th Cir. 1972) ................................................................... 16

*Fleet Messenger Serv., Inc. v. Life Ins. Co. of N. Am.*,
 315 F.2d 593 (2d Cir. 1963) ................................................................ 12

*Fletcher Jones Co. v. United Pac. Ins. Co.*,
 181 Cal. App. 2d 202 (2d Dist. 1960) ................................................ 19

*Fresno Econ. Imp. Used Cars, Inc. v. United States Fid. & Guar. Co.*,
 76 Cal. App. 3d 272 (1977) ........................................................... 12, 18

*Gianoukas v. Campitiello*,
 No. 09 Civ. 1266 (PAC), 2009 WL 3270808 (S.D.N.Y. Oct. 13, 2009) ............... 11

*Global Network Commc'ns., Inc. v. City of New York*,
 458 F.3d 150 (2d Cir. 2006) ............................................................ 5, 21

*Griffen v. Allstate Ins. Co.*,
 920 F. Supp. 127 (C.D. Cal. 1996) ...................................................... 22

*Gunderson v. Fire Ins. Exch.*,
 37 Cal. App. 4th 1106 (1st Dist. 1995) ............................................... 23

*Harris v. Provident Life & Acc. Ins. Co.*,
 310 F.3d 73 (2d Cir. 2002) ............................................................... 22

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
 62 F.3d 69 (2d Cir. 1995) ................................................................. 11

*Int'l Serv. Ins. Co. v. Gonzales*,
 194 Cal. App. 3d 110 (3rd Dist. 1987) ............................................... 19

*Jarrett v. Allstate Ins. Co.*,
 209 Cal. App. 2d 804 (1st Dist.1962)............................................ 12, 14, 18

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*,
 No. 01 Civ. 2946 (DLC), 2004 WL 1944457 (S.D.N.Y. 2004) ........................... 23

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
 313 U.S. 487 (1941) ........................................................................ 12

*Lee v. Park Lane Togs, Inc.*,
 81 F. Supp. 853 (S.D.N.Y. 1948) ....................................................... 24

*Marosu Realty Corp. v. Community Pres. Corp.*,
 26 A.D.3d 74 (1st Dept. 2005) ........................................................... 12

*Maryland Cas. Co. v. W.R. Grace & Co.*,
 218 F.3d 204 (2d Cir. 2000) .............................................................. 23

*Melchior v. New Line Prods., Inc.*,
 106 Cal. App. 4th 779 (2d Dist. 2003) ............................................... 23

*Mixon v. Gray Drug Stores, Inc.*,
   81 F.R.D. 413 (N.D. Ohio 1978) ........................................................................... 24

*In re New Times Sec. Servs., Inc.*,
   371 F.3d  68 (2d Cir. 2004) ................................................................................... 16

*Olin Corp. v. Ins. Co. of N. Am.*,
   743 F. Supp. 1044 (S.D.N.Y. 1990) , *aff'd*, 929 F.2d 62 (2d Cir. 1991) ............... 12

*In re Orion Pictures Corp.*,
   4 F.3d 1095 (2d Cir.1993) .............................................................................. 23, 24

*R.A. Stuchbery & Others Syndicate 1096 v. Redland Ins. Co.*,
   154 Cal. App. 4th 796 (1st Dist. 2007).................................................................. 20

*SIPC v. Bernard L. Madoff Investment Securities, LLC*,
   No. 08-01789 (BRL) (S.D.N.Y. Bankr.) ........................................................ 5, 6, 15

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ................................................................................... 11

*Scarola v. Ins. Co. of N. Am.*,
   31 N.Y.2d 411 (1972)............................................................................................ 19

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) .................................................................................. 18

*United States v. DiPascali*,
   No. 09-CR-764 (S.D.N.Y. 2009) ........................................................................... 21

*United States v. Madoff*,
   No. 09-CR-213 (S.D.N.Y. 2009) ....................................................................... 5, 21

*United States v. McKeon*,
   738 F.2d 26 (2d Cir. 1984) ................................................................................... 21

*Walker v. USAA Cas. Ins. Co.*,
   474 F. Supp. 2d 1168 (E.D. Cal. 2007) ................................................................. 23

*Waller v. Truck Ins. Exch., Inc.*,
   11 Cal. 4th 1 (1995)................................................................................... 12, 20, 22

*Wooden v. Bd. of Regents*,
   247 F.3d 1262 (11th Cir. 2001)............................................................................. 24

## **Statutes**

Fed. R. Civ. P. 12(b)(6) .................................................................................. 5, 24

Rule 12(b)(6)  ................................................................................................. 4, 10

N.Y. Ins. Law § 3401 ........................................................................................... 19

Securities Investor Protection Act of 1979 ("SIPA") 15 U.S.C. §78aaa *et seq*............................ 15

## PRELIMINARY STATEMENT

This is the third attempt by Plaintiffs Robert and Harlene Horowitz to allege a claim under their homeowners' policy arising from their Bernard Madoff investment, notwithstanding that they admittedly recovered all of their investment and indeed realized a net gain of more than $225,000.  The policy in question provides coverage for *losses* of *money*, *securities or other property* that are the *direct* result of a fraud, and expressly excludes coverage for indirect losses, including an inability to realize gains that might have accrued in the absence of the alleged fraud. There is no dispute that Plaintiffs did not suffer any loss, let alone one that resulted directly from a fraud.  Accordingly, Plaintiffs cannot state a claim.

Plaintiffs have strained mightily to overcome the fact that they suffered no loss on their Madoff investments (unlike countless others whose claims Defendant American International Insurance Company of California ("AIICC")[1] has paid in full), and to plead claims on behalf of a purported class of policyholders who invested with Bernard L. Madoff Investment Securities ("Madoff").  Their original theory was that they lost *money* because they were not paid the fictitious gains reflected on their account statements.  Recognizing that in fact they did not lose any money, because they recovered their invested funds and more, Plaintiffs amended their complaint to assert that they also lost "securities" because their "account statements [] showed real historical performance by real securities allegedly purchased by Madoff."  Plaintiffs sought to recover their fictitious gains or, in the alternative, their "reasonably expected earnings . . .

---

[1]    In addition to AIICC, the insurer that issued the Policy, Plaintiffs have also named American International Group, Inc. ("AIG"), as well as other entities affiliated with AIG, including:  AIU Holdings Inc. (now doing business as Chartis Inc.) and AIG Property Casualty Group (now doing business as Chartis Inc.).  Defendants do not contest, for purposes of this motion only, the improper joinder and/or naming of certain parties, e.g. AIG Private Client Group, which is merely a trade name rather than an independent legal entity.

1

during the greatest bull market in history" based upon a "reasonable growth assumption" or an "implied interest rate."

In order to address the arguments of Defendants who sought to dismiss the First Amended Complaint, on the eve of the motion conference with the Court, Plaintiffs served a proposed Second Amended Complaint. But rather than overcome the arguments Defendants put forth, Plaintiffs repeated the same deficient theories that permeated the Complaint, and the First Amended Complaint, and repackaged them with some new counts for Declaratory Relief. One of these new claims sought effectively to place the burden on Defendants to show that Plaintiffs' losses did not arise during some "pre-Ponzi" period. But this theory cannot be squared with Plaintiffs' admission that they did not make any investments with Madoff until 1997, and their allegation in the original complaint (quietly deleted from later iterations) that the fraud began at the latest by the early 1990s.

This Memorandum will demonstrate that Plaintiffs simply are unable to plead a viable claim, and their Second Amended Complaint should be dismissed without leave to amend. *First,* the policy at issue (the "Policy") only provides coverage for a "*loss* of money, securities or other property . . . resulting *directly* from fraud" (emphasis added).[2] Because Plaintiffs withdrew more money than they deposited, they cannot demonstrate that they have suffered a "loss" under the Policy. Nor can they satisfy the requirement to show a loss that is a "direct" result of fraud. As courts have repeatedly recognized, "direct" loss in this context is limited to actual pecuniary loss and does not include fictitious profits. *See, e.g.*, *Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co.*, No. CV305-167, 2007 WL 4973847, at *4 (S.D. Ga. Sept. 14, 2007). Their claims must

---

[2]    The Policy is Exhibit A to the Declaration of Michael B. Carlinsky, submitted with this motion. The Policy has been consecutively numbered for the convenience of the Court. All references to Exhibits refer to the exhibits annexed to the Carlinsky Declaration.

be dismissed for this reason alone.

*Second*, Plaintiffs seek recovery of amounts that fall squarely within the express language of the Policy's exclusions.  The Policy excludes "any loss that is an indirect result of any fraud guard event including but not limited to: (a) [the policyholder's] inability to realize income that [the policyholder] would have realized had there been no loss or damage to money, securities, or other property."  To avoid any doubt, the Policy disclaims "any guarantee of the financial performance of any financial instrument or investment vehicle."  Plaintiffs seek to recover "indirect" losses of "income [they] would have realized had there been no loss or damage to money, securities, or other property" and effectively seek to hold AIICC liable as guarantor of the "financial performance" of their "investment vehicle."  The clear and unambiguous terms of the Policy's exclusions bar Plaintiffs' claims as a matter of law.

*Third*, the Policy only covers losses arising directly from a "fraud," which the Policy defines as an "intentional perversion of the truth . . . perpetrated in order to induce you or a family member to part with *something of value*" (emphasis added).  Plaintiffs have not alleged that they were induced "to part with something of value."  Nor could they.  The fictitious gains promised by Madoff have no value and are thus not covered by the Policy.

*Fourth*, Plaintiffs lack an insurable interest in the insured property, which California law requires to state a claim under an insurance policy.  Only pecuniary interests qualify as insurable interests.  Illusory losses, like the ones alleged by Plaintiffs, cannot support a claim.

*Fifth*, Plaintiffs' latest gambit to evade dismissal—that there was a "pre-Ponzi" period during which Plaintiffs invested—contradicts Plaintiffs' own admissions that they invested years after the Ponzi scheme began and does not come close to alleging a loss "during the policy period" as the Policy requires.

3

*Finally*, Plaintiffs' new declaratory judgment claims should be dismissed as redundant and unnecessary.

In sum, Plaintiffs have suffered no loss.  They have no claim under the Policy.  No set of allegations could change this simple fact.  Accordingly, the Court should dismiss their third complaint without leave to amend.

## STATEMENT OF FACTS

### A.      The Madoff Ponzi Scheme

In 1997, a Revocable Trust known as the Horowitz Family Trust (the "Trust")[3] invested with Madoff.  (Ex. B ¶ 11.)[4]  By the time the investment was made, Madoff was indisputably already a Ponzi Scheme.  (Ex. C ¶ 3.)[5]  On December 10, 2008, Madoff revealed that his investment advisory business was a fraud, that "it [was] all just one big lie," and that it was "basically a, giant Ponzi scheme."  (Ex. B ¶ 27.)  Madoff had been for years "paying returns to certain investors out of the principal received from other, different, investors."  (Ex. D ¶ 4(d).)[6]

---

[3]   For purposes of this motion, AIICC assumes but does not concede that Plaintiffs have standing to bring a claim under the Policy even though the actual investment was made (and the alleged "losses" were suffered) not by the Plaintiffs, but by the Trust, an entity not insured under the Policy.  AIICC reserves the right to assert as a defense that Plaintiffs lack such standing and/or that the Trust's losses are not covered by the Policy.

[4]   Exhibit B is the Second Amended Complaint ("SAC") filed January 7, 2010.

[5]   Exhibit C is Plaintiffs' Initial Complaint filed August 19, 2009.

[6]   Exhibit D is the Complaint of Federal Bureau of Investigations Special Agent Theodore Cacioppi sworn to on December 11, 2008 ("Cacioppi Complaint"), referenced in the Amended Complaint.  When ruling on a motion to dismiss under Rule 12(b)(6), the Court may consider the complete text of any document referred to or relied upon in the Complaint.  *See Cantor v. Am. Banknote Corp.*, No. 06 Civ. 1392(PAC), 2007 WL 3084966, at *4 (S.D.N.Y. Oct. 22, 2007) (Crotty, J.) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (internal quotation marks omitted)).  Here, the Second Amended Complaint references and quotes from the Policy, the Cacioppi Complaint, and several other documents related to the crimes committed by Bernard Madoff.  Accordingly, the Court may rely on the statements contained in these documents as if they were expressly alleged in the Complaint.

Madoff admitted that his investment advisory company "was insolvent and that it had been for years." (*Id.*)  On December 11, Madoff admitted to federal agents that "[t]here [was] no innocent explanation" and that he had "paid investors with money that wasn't there." (*Id.* ¶ 5)

Madoff was then arrested by federal agents and charged with securities fraud.  (Ex. B ¶ 20.)  On March 12, 2009, Madoff pleaded guilty to 11 counts of a criminal information that included charges of securities fraud.  (Ex. B ¶ 29.)  As Madoff admitted in his plea hearing:  "Up until I was arrested . . . I never invested [customer] funds in the securities, as I had promised. Instead, those funds were deposited in [a bank account].  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the [bank account] that belonged to them or other clients to pay the requested funds."  (Ex. E at 23.)[7]  The account statements were wholly fictitious, having been created solely to "create the illusion that these stocks had been purchased or sold . . . ."  (Ex. F at 11.)[8]  Madoff also testified that his "fraud began in the early 1990s."  (Ex. E at 25; *see also* Ex. C ¶ 3.)   On June 29, 2009, the Court sentenced Madoff to a term of 150 years in prison.  (*See, infra,* n. 27.)

---

[7]   Exhibit E is a transcript of Madoff's guilty plea in *United States v. Madoff*, No. 09-CR-213 (S.D.N.Y. March 12, 2009).

[8]   Exhibit F is the Memorandum of Law in Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed on Last Customer Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections With Respect to the Determinations Relating to Net Equity, *SIPC v. Bernard L. Madoff Investment Securities, LLC,* No. 08-01789 (BRL) (S.D.N.Y. Bankr. October 16, 2009). In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a district court may rely on matters of public record,"  *Cantor v. Am. Banknote Corp.*, No. 06 Civ. 1392(PAC), 2007 WL 3084966, at *4 (S.D.N.Y. Oct. 22, 2007) (Crotty, J.) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1995)), including documents filed in another court in a related criminal action, *see Global Network Commc'ns., Inc. v. City of New York*, 458 F.3d 150, 153 (2d Cir. 2006) (affirming dismissal where the district court took notice of the plaintiff's sole shareholder's "testimony as a government witness in certain criminal proceedings" that was not mentioned in the complaint).

### B.      Madoff's Investment Advisory Company Has Long Been Insolvent

Once the Government determined that Madoff had long been operating a Ponzi scheme, his investment advisory company was placed in liquidation and Irving Picard was appointed as trustee. Trustee Picard's investigation has uncovered "no evidence of any profitable economic activity having been undertaken by the [investment advisory] business of [Madoff]." (Ex. F at 2.) The Trustee has also concluded that "any gains that appeared to be associated with [Madoff] customer accounts were entirely fabricated." (*Id.*) In evaluating the claims made by Madoff customers, like Plaintiffs, the Trustee has determined that only those customers whose deposits exceeded their withdrawals have legitimate claims against the Madoff estate. (*Id.* at 1-2.) The Trustee has "begun satisfying customer claims [and] has issued its determinations using [this] 'money in/money out approach.'" (Ex. G at ¶ 112.)[9]

### C.      The Policy

At the time the Madoff Ponzi scheme was uncovered, Plaintiffs were among those fortunate investors who had already withdrawn their entire principal—and more—from their account with Madoff. (Ex. B ¶ 7.) Plaintiffs had purchased a homeowners' insurance policy from AIICC which included a "Fraud SafeGuard Coverage" endorsement. (*Id.* ¶ 24-25; *see also* Ex. A at A-36-41.)[10] Under the Policy, AIICC insured Plaintiffs and their "family member[s] for a loss of money, securities, or other property … resulting directly from fraud, embezzlement, or forgery perpetrated against you or a family member during the Policy Period." (Ex. A at A-37.)

---

[9]   Exhibit G is the Trustee's First Interim Report for the Period Dec. 11, 2008 Through June 30, 2009, *SIPC v. Bernard L. Madoff Investment Securities, LLC,* No. 08-01789 (BRL) (S.D.N.Y. Bankr. July 9, 2009).

[10]   The claim that Plaintiffs paid $11,400 "for coverage up to ... $30,000 .. for 'the loss of money [or] securities...'" is incorrect. (Ex. B. ¶ 7.) Plaintiffs paid an $11,400 total premium for their entire homeowners' policy. (*See* Ex. A at A-1.) The cost for the Fraud SafeGuard endorsement was $115.

The Policy defines "money" as "[c]urrency, coins and bank notes in current use and having a face value … [t]ravelers checks, register checks and money orders." (*Id.*)  The Policy defines "Securities" as "negotiable and non-negotiable instruments or contracts representing either money or property." (*Id.*)  And the Policy, effective only since October 1st, 2008, covers a loss "during the Policy Period.  Lastly, the Policy expressly states that in order to make a claim arising out of a "Fraud," the policyholder must establish that he or she was "induced . . . to part with something of value," such as money, securities, or other property.  (*Id.* at A-36.)

The Policy also contains several exclusions.  Relevant to this motion, the Policy does not cover "any loss that is an indirect result of any fraud guard event including but not limited to:  (a) [the policyholder's] inability to realize income that [he or she] would have realized had there been no loss or damage to money, securities, or other property." (*Id.* at A-40.)  The Policy also disclaims "any guarantee of the financial performance of any financial instrument or investment vehicle." (*Id.*)

### D.    Plaintiffs' Insurance Claim

On December 29, 2008, Plaintiffs filed a claim under the Policy for the Policy's limit of $30,000 per person.  (Ex. H at H-1.)[11]  Plaintiffs claimed that they lost the balance reflected on the very last account statement received from Madoff before the scheme was revealed, over $8.5 million.  (Ex. B ¶¶ 30 & 33.)  The Madoff account statements provided by Plaintiffs[12] show that

---

[11]    Exhibit H is a Letter from Lisa S. Garrison, Claims Analyst, AIG Private Client Group on Behalf of American International Insurance Company of California, to Robert and Harlene Horowitz (February 18, 2009), referenced in the SAC at paragraph 32.  Exhibit H has been consecutively numbered for the convenience of the Court.

[12]    Although Plaintiffs invested in 1997, they gave the Defendants only their 2003-2008 account statements.  (Ex. H at H-6.)

they deposited $4,327,230.55[13] into their Madoff account and withdrew $4,553,000.00, for a net

gain of $225,769.45.  (Ex. H at 8.)  AIICC denied Plaintiffs' claim because their "withdrawals

from the investment account(s) exceeded the amount of [their] capital contributions."  (Ex. B

¶ 32; Ex. H at H-1.)

## PROCEDURAL HISTORY

### A.    The Original Complaint

Plaintiffs filed this putative class action on August 19, 2009, and asserted three causes of

actions against AIICC:  Breach of Contract, Breach of the Implied Covenant of Good Faith and

Fair Dealing, and Unjust Enrichment.  (Ex. C ¶ 1.)  Plaintiffs purported to assert these claims on

behalf of "[a]ll AIG policyholders in the United States who lost money in connection with

Bernard Madoffs Ponzi scheme during the time they held an AIG homeowner's insurance policy

with AIG Fraud SafeGuard coverage."[14]  (*Id.* ¶ 35.)  The Initial Complaint only alleged a loss of

"money" under the Policy and not a loss of "securities" or "other property" as those terms are

defined in the Policy.  (*See, e.g.*, *id.* ¶ 22 ("Plaintiffs *held and lost money* from their account . . .

which had a final balance of over $8,500,000.00" (emphasis added)).)

The Initial Complaint alleged that Defendants' had engaged in an "ad hoc effort to

deprive their policyholders of fraud protection coverage … by re-defining the terms of coverage

in order to deny certain claims now that their policyholders lost millions of dollars in the largest

Ponzi scheme in history."  (*Id.* ¶ 1.)  Plaintiffs further alleged—consistent with all the publicly

---

13    None of the Plaintiffs' three complaints alleges the specific dates and/or amounts they
invested with Madoff.  According to the Plaintiffs' records, they invested $1,768,000 in 1997,
$1,216,317 in 1998, $1,200,000 in 2000, and $145,913.55 in 2002.  (Ex. H-8.)

14    Defendants have filed a motion to strike the class action allegations of the complaint
in a motion filed concurrently with this one.  Should this Court deny this motion to dismiss, it
should nevertheless strike the class action allegations which suffer numerous deficiencies, as
further described in the motion.

established information about the scheme—that "Madoff, through his company Bernard L. Madoff Investment Securities ("BMIS"), conducted a Ponzi scheme (the "Madoff fraud") *since at least the early 1990s*." (Ex. C ¶ 3 (emphasis added).) The Initial Complaint maintained that, under the Policy, "Plaintiffs' and the Class members' loss is the amount shown on their last account statement." (*Id.* ¶ 25.)

### B.      Plaintiffs' Second Effort To Plead Viable Claims

On September 22, 2009, Plaintiffs filed an amended complaint (the "First Amended Complaint" ), which reflected a substantial change in their theories of relief.[15] First, realizing that they would be unable to show a loss of "money" as that term is defined in the Policy (because they recouped all of their money and more), Plaintiffs expanded their alleged loss to include "securities [or] money" under the Policy. (Ex. I ¶ 30.) Plaintiffs supported this claim by making the outlandish and unsupported claim that their Madoff "account statements showed real historical performance by real securities allegedly purchased by Madoff." (*Id.* ¶ 8.)

Second, understanding that they were unlikely to recover the fictional account balance listed on their last Madoff account statement, Plaintiffs hedged their bets by claiming that they were entitled "to some reasonable growth assumption on their funds" because they "reasonably expected earnings on their money, especially during the greatest bull market in history." (*Id.*)

Finally, Plaintiffs also tellingly dropped their allegation that Madoff had been engaged in a fraud fraud "since at least the early 1990s." (*Compare* Ex. C ¶ 3, *with* Ex. I ¶ 3.)

### C.      Rather Than Respond To Defendants' Proposed Motion To Dismiss, Plaintiffs Make A Third Attempt To Plead Viable Claims

On November 25, 2009, Defendants notified the Court of their intention to file a motion to dismiss the First Amended Complaint and a motion to strike the class allegations. (Ex. J at 1-

---

[15]    Exhibit I is the First Amended Complaint filed on September 22, 2009.

3.)[16]   Rather than defend their existing allegations, on the eve of the conference with the Court, Plaintiffs served a draft Second Amended Complaint.  (*See* Ex. K.)[17]  This latest pleading re-alleged the same general theories of liability, but with three primary additions.  First, Plaintiffs incorrectly asserted that the SEC had—in a brief that addressed a statute relevant only to liquidating Madoff's business and not the Policy—endorsed the concept that Madoff's victims are entitled to an implied interest rate on their investment in the Ponzi scheme.  (Ex. B ¶ 35.)  Second, Plaintiffs repackaged their allegation that at least some of their alleged "losses" stemmed from phantom investments made before the alleged Ponzi scheme began, and included a new count for declaratory relief based on this theory.  Notwithstanding their allegation in the Initial Complaint that the fraud began at least by the early 1990s, Plaintiffs attempted to shift the burden to Defendants and asserted that they could recover on this new theory because "Defendants are unable to identify the date the BMIS Ponzi Scheme started," and therefore could not calculate the Horowitzes' loss under the Policy on a cash-in/cash-out basis.  (*Id.* ¶ 80.)  Finally, Plaintiffs asserted two additional declaratory judgment counts that are redundant of either their affirmative claims and/or yet unasserted affirmative defenses.  (*Id.* ¶¶ 76-78 and 82-84.)

At the conference with the Court the day after Defendants received the draft Second Amended Complaint, the Defendants' consented and the Court allowed Plaintiffs to file the Second Amended Complaint, permitted the Defendants time to address the new complaint in their motions, and stayed discovery pending resolution of the Defendants' motions.

---

[16]   Exhibit J is a letter from Michael B. Carlinsky to Honorable Paul A. Crotty (Nov. 25 2009).

[17]   Exhibit K is an e-mail from Josh Keller to Michael B. Carlinsky *et al*. (Jan. 4, 2010), attaching a draft copy of the Second Amended Complaint and a "blackline" showing the differences between the First and Second Amended Complaints.

**ARGUMENT**

Under Rule 12(b)(6), a Complaint must be dismissed if it does not contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks and citations omitted). To survive a motion to dismiss, a plaintiff must allege facts that are enough to raise her right to relief "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff's obligation to demonstrate his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. Rather, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," not just conceivable. *Id* at 570. *See also Gianoukas v. Campitiello*, No. 09 Civ. 1266 (PAC), 2009 WL 3270808, at*2 (S.D.N.Y. Oct. 13, 2009) (To avoid dismissal, the complaint must contain "enough facts to state a claim to relief that is plausible on its face, *i.e.* facts that nudge the plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S. Ct. at 1949 (internal quotations omitted).

Where, as here, a complaint is based upon the terms of a contract, the actual provisions of the contract, rather than Plaintiffs' characterization of them in their pleading, are controlling on a motion to dismiss. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (contract between parties "integral" to complaint alleging breach and may be considered on a motion to dismiss); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808–09 (2d Cir. 1996) (permissible to consider full text

11

of documents partially quoted in complaint); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991) (permissible to consider documents relied upon by plaintiff in drafting the complaint and integral to the complaint).

Under California law,[18] courts must enforce the plain meaning of a clear and unambiguous insurance policy. *Waller v. Truck Ins. Exch., Inc.,* 11 Cal. 4th 1, 18–19 (1995); *see also AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821–822 (1990). "[W]hen the terms of the policy are plain and explicit the courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed." *Jarrett v. Allstate Ins. Co.*, 209 Cal. App. 2d 804, 810 (1st Dist. 1962); *see also Fresno Econ. Imp. Used Cars, Inc. v. United States Fid. & Guar. Co.*, 76 Cal. App. 3d 272, 280 (1977) ("A court cannot and should not do violence to the plain terms of an insurance contract . . . ." (alterations omitted)) (quoting *Matsuo Yoshida v. Liberty Mut. Ins. Co.*, 240 F.2d 824, 826–827 (9th Cir. 1957)).[19]

## I.    PLAINTIFFS' CANNOT STATE A BREACH OF CONTRACT OR DECLARATORY RELIEF CLAIM BECAUSE THEY HAVE FAILED TO ALLEGE FACTS GIVING RISE TO A "LOSS" INSURED UNDER THE POLICY

---

[18]    For purposes of this motion only, AIICC assumes on the basis of the allegations in the Complaint that California law controls because it is Plaintiffs' home state, the location of the insured dwelling, and the location of both the Policy's broker and the company from which the Policy was purchased. Federal courts sitting in diversity jurisdiction must apply the choice of law rules of the forum, *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496–497 (1941), and New York law requires courts to apply the law of the jurisdiction having "the most significant contacts with the matter in dispute," *Auten v. Auten*, 308 N.Y. 155, 160 (1954). *See Fleet Messenger Serv., Inc. v. Life Ins. Co. of N. Am.*, 315 F.2d 593, 596 (2d Cir. 1963); *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226 (1993). In examining choice of law questions involving insurance contracts, New York courts consider the following factors: the location of the insured risk; the insured's residence; the place where the policy was issued and delivered; the location of the broker or agent placing the policy; the place where the premiums were paid; and the insurer's place of business. *Olin Corp. v. Ins. Co. of N. Am.*, 743 F. Supp. 1044, 1049 (S.D.N.Y. 1990) , *aff'd*, 929 F.2d 62 (2d Cir. 1991).

[19]    The same holds true under New York law. *See 805 Third Ave. Co. v. M.W. Realty Assoc.*, 58 N.Y.2d 447, 451 (1983); *Marosu Realty Corp. v. Community Pres. Corp.*, 26 A.D.3d 74, 82 (1st Dept. 2005).

The Policy at issue in this action insures against "loss of money, securities or other property . . . resulting directly from fraud . . . ." (Ex. A at A-37.)  Plaintiffs cannot state a cause of action under the Policy because they admit that they safely "withdrew their principal" before the scheme was uncovered.  (Ex. B ¶ 8; *see also id.*  ¶¶ 41-42.)  To circumvent this fatal deficiency, Plaintiffs claim under the Policy for "earnings" they allegedly "reasonably expected" from their Madoff account based upon "reasonable growth assumptions" or perhaps "an implied interest rate."  (*Id.* ¶¶ 8 & 35.)  For example, the SAC alleges that the "Plaintiffs . . . did not give Madoff their money with the expectation that he would hide it under a rock or lock it in a safe, such that no money would remain *after they withdrew their principal*.  Plaintiffs . . . reasonably expected earnings on their money, especially during the greatest bull market in history"  (*Id.* ¶ 8 (emphasis added).)  Plaintiffs claim that the Policy entitles them to recover "an implied interest rate" over and above the capital disbursements that they had already withdrawn from their Madoff account.  (*Id.* ¶ 35.)

As discussed further below, the SAC should be dismissed as a matter of law because:

- Plaintiffs have failed to allege a "loss of money, securities, or other property . . . resulting directly from fraud" as the Policy requires;

- The Policy clearly and unambiguously excludes Plaintiffs' claims for "reasonably expected earnings on their money";

- Plaintiffs have failed to allege that they "parted with something of value" based upon fraud, as the Policy requires;

- Plaintiffs' claims—which seek recovery of the fruits of a fraud—are barred under common law;

- Plaintiffs have failed to allege when any "pre-Ponzi" period began, that they invested during this period, or that they earned sufficient returns during this "pre-Ponzi" period to compensate for the approximately $250,000 profit they earned on their investment with Madoff;

- In any event, it is clear that the Ponzi Scheme began long before the Policy effective date of October 1st, 2008, so Plaintiffs cannot allege a loss "during the

13

policy period;" and

- Plaintiffs lack standing to bring claims for declaratory relief because they have a fully ripe claim for alleged damages.

**A.     Plaintiffs Cannot Allege Either A Loss Or One That Is The Direct Result Of The Madoff Fraud**

The Policy insures against "a *loss* of money, securities or other property … resulting *directly* from fraud . . . ." (Ex. A at A-36 (emphasis added).)[20]   Plaintiffs allege neither a "loss" nor one that resulted "directly from fraud."

First, Plaintiffs cannot satisfy the requirement to allege a "loss of money" or "securities" under the Policy.  Quite to the contrary, Plaintiffs admit that they received all of their actual money back from Madoff—and more—through withdrawals from their account before the Ponzi scheme was uncovered.  (Ex. B ¶¶ 8 & 42.)  Had plaintiffs lost their principal, they might have had a claim for a loss of "money . . . resulting directly from fraud" as the Policy requires.  But this is a case brought to recoup fictitious profits or lost investment opportunities, not actual money lost as a direct result of the Madoff fraud.  It is neither reasonably possible nor logical to construe "loss" as encompassing wholly fictitious and non-existent paper profits or gains in an amount completely fabricated by the fraud-doer.  In a case such as this, where "the terms of the policy are plain and explicit" in limiting recovery to a "direct" loss of "money" or "securities," this Court should "not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed." *Jarrett*, 209 Cal. App. 2d at 810.

In an effort to create a covered "loss" where none exists, Plaintiffs' latest complaint

---

[20]   The Policy defines "money" as "[c]urrency, coins and bank notes in current use and having a face value." (Ex. A at A-36.)  The Policy defines "securities" as "negotiable and non-negotiable instruments or contracts representing either money or property." (*Id*. at A-37.) "Other Property" is defined as "jewelry, precious metals, antiques, fine art, ceramics, fur, collectibles and gemstones." (*Id*.)

alleges that they should be compensated for the reduction in value in their invested funds based on inflation.  In particular, Plaintiffs claim that the SEC "recently asserted a … 'constant dollar' position in a brief filed in the Madoff bankruptcy, arguing that '[t]he Commission believes … that in determining customer claims under the cash-in/cash-out method, the amount of payment should be calculated in constant dollars by adjusting for the effects of inflation.  (Ex. B ¶ 35, quoting Ex. L at 1.)[21]  Plaintiffs then posit that applying such an approach in this case "would result in a payment of the fully policy limits to all or virtually all Class members."  (*Id.*)

Plaintiffs' new allegations are irrelevant to the issues here.  The SEC was addressing a statutory term ("net-equity") under the Securities Investor Protection Act of 1979 ("SIPA") 15 U.S.C. §78aaa *et seq.*; it was not addressing the interpretation or application of the Policy, which does not provide coverage adjustments for inflation.  This is made clear by comparing certain provisions of the Horowitzes' homeowners' policy, which expressly provide for such coverage (Ex. A at A-11 ("[T]he amount of [replacement cost] coverage will be increased daily to reflect the current effect of inflation"), with the Fraud SafeGuard endorsement, which does not.[22]

Even if Plaintiffs could satisfy the requirement of a "loss"—which for the reasons just

---

[21]    Exhibit L is the Memorandum of Law of the Securities and Exchange Commission Supporting Trustee's Determination That Net Equity Should Not Be Based on Securities Positions Listed On Last Statements, and Supporting In Part Trustee's Determination That Net Equity Should Be Based Upon Amounts Deposited Less Amounts Withdrawn, *SIPC v. Bernard L. Madoff Investment Securities, LLC,* No. 08-01789 (BRL) (S.D.N.Y. Bankr. December 11, 2009).

[22]    Moreover, Plaintiffs distort the SEC's position.  In the SIPA liquidation of Madoff's investment advisory business, the SEC "agree[d] generally that … net equity should be based upon the cash-in/cash-out method."  (Ex. L at 1.)  The only caveat to the SEC's endorsement of the Trustee's position was that "*[b]ecause customers will be receiving pro rata distributions* from the limited pool of assets recovered for the BLMIS estate, calculating claims in constant dollars treats all investors fairly by taking into account the economic reality that a dollar invested in 2008 has a different value than a dollar invested twenty years earlier.*"  (*Id.* (emphasis added).)  Nowhere does the SEC even suggest that investors were entitled to the "reasonable growth assumption on their funds" demanded by the Plaintiffs in this case.

stated they cannot—they could not satisfy the Policy requirement to allege a loss that was a "direct" result of fraud.  Consistent with the plain meaning of the Policy, courts in analogous cases have repeatedly recognized that a fictitious loss resulting from a Ponzi scheme or other fraudulent activity is not "direct" within the meaning of insurance policies.  In *Citizens Bank*, 2007 WL 4973847, at *1, for example, a bank employee embezzled funds through a Ponzi scheme by forging loan agreements and then paying off those loans in part with funds obtained from new forged loans.  When the scheme was discovered, there were 39 outstanding loans recorded on the banks books for $1.4 million.  *Id.*  The bank's actual pecuniary losses were only $884,000.

Like here, the bond covered only "direct" loss.  The bank claimed that it had suffered a $1.4 million bonded loss because it had to write off the $1.4 million from its books.  *Id.* at *3.  The district court agreed with the insurer that the "direct loss" was the actual loss of "cash or other such pecuniary loss" which in this case was limited to the $884,000.  *Id.* at *4 (internal citations and quotation marks omitted).  In contrast, the loss of the "income [the bank] would have earned on the funds had the loans been legitimate" was precisely the type of "indirect" loss that was excluded from coverage.  *See id.* at *5.[23]  As the Second Circuit has held, "basing customer recoveries on fictitious amounts . . . would allow customers to recover arbitrary

---

[23]   *Citizens Bank* is hardly unique.  The cases are legion holding that insurance policies or fidelity bonds insuring against fraud and covering only "direct losses" do not cover theoretical or book-keeping losses.  *See, e.g.*, *FDIC v. United Pac. Ins. Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994) ("Language in a fidelity bond to the effect that the insured is covered for 'losses directly resulting from . . .' indicates a direct loss or the actual depletion of bank funds caused by the employee's dishonest acts." (citations omitted)); *Everhart v. Drake Mgmt., Inc.*, 627 F.2d 686, 691 (5th Cir. 1980) (holding that where a bank has suffered no increase in liabilities, but rather experienced only a "shifting of liabilities," it suffered no loss and therefore was not entitled to recover against insurer); *Fid. & Dep. Co. of Md. v. Usaform Hail Pool, Inc.*, 463 F.2d 4, 6–7 (5th Cir. 1972) (holding that a bank could not recover under a fidelity bond where its assets were neither increased nor diminished by the fraud of its employees).

16

amounts that necessarily have no relation to reality." *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 88 (2d Cir. 2004) (internal quotation marks omitted).

Like the "income the bank would have earned on the funds had the loans been legitimate," the expected profits that Plaintiffs could have earned had the Madoff accounts statements been legitimate are not the "direct" loss from fraud under the Policy.  Plaintiffs admit that Madoff's investment advisory business "was a fraud and that 'it was all just one big lie,' . . . 'basically, a giant Ponzi scheme' . . . ."  (Ex. B ¶ 27.)  As described above, both Madoff himself and the Trustee overseeing the liquidation of his investment business have acknowledged that any profits reflected in the account statements were entirely fabricated.  Plaintiffs concede they have recouped the money they actually invested.  Any other purported losses are not "direct" losses and are not recoverable under the Policy.

### B.   Plaintiffs' Claim Falls Within The Express Language Of The Policy Exclusions

Plaintiffs' claim for "reasonably expected earnings" must be dismissed for the additional reason that it falls squarely within the express terms of the Policy exclusions.  The Policy excludes "any loss that is an *indirect* result of any fraud guard event including but not limited to: (a) [the policyholder's] inability to realize income that [he or she] would have realized had there been no loss . . ."  (Ex. A at A-40 (emphasis added).)  The Policy also expressly states that it does "not cover any guarantee of the financial performance of any financial instrument or investment vehicle."  (*Id*.)

Plaintiffs are seeking coverage for precisely what the Policy excludes: the "indirect" fabricated losses resulting from their "inability to realize income that [the policyholder] would have realized had there been no loss . . . ."  They are asking AIICC to provide a "guarantee [in the amount of an implied interest rate] of the financial performance" of their Madoff investment.

Because the terms of the policy are plain and explicit in excluding Plaintiffs' claim for a return on their original investment, this Court should dismiss the SAC. *See Jarrett*, 209 Cal. App. 2d at 810; *see also Fresno*, 76 Cal. App. 3d at 281.

### C.   Plaintiffs Fail To Allege That They "Parted With Something Of Value"

Plaintiffs similarly cannot meet the requirement of the Policy that they show they were induced to "part with something of value" in reliance upon fraud. (Ex. A at A-36.) The Policy insures only against "loss of money, securities or other property . . . resulting directly from *fraud* . . . ." (*Id.* at A-37 (emphasis added).) The Policy defines "fraud" as an "intentional perversion of the truth . . . perpetrated in order to induce you or a family member to part with *something of value*." (*Id.* (emphasis added).)

While the money that Plaintiffs invested with Madoff constitutes "something of value," Plaintiffs concede that they received their principal back and did not lose it as a direct result of fraud. Instead, all Plaintiffs have been forced "to part with" are the fraudulently reported gains that appeared on their account statement. But those gains, being the product of fraud, never constituted "something of value," as the Policy expressly requires.

Indeed, Plaintiffs admit that Madoff's company was insolvent by $50 billion. (Ex. B ¶ 27; Ex. E at 23.) Madoff's investment advisory business therefore produced *no* legitimate profits—and nothing of value to Plaintiffs. As Judge Ponser explained in *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995), "[i]t is no answer that some or for that matter all of [an investor's] profit may have come from 'legitimate' trades made by the [Ponzi scheme operator]. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations." Because their claim seeks recovery of improperly reported gains

that have no value, the SAC should be dismissed for this additional reason.[24]

### D.     Plaintiffs Do Not Have An Insurable Interest Required To Bring A Claim

Even if Plaintiffs could somehow overcome the plain language of the Policy, which they cannot, their claims would still fail under well established common law.  In California, no person can recover under an insurance policy without an insurable interest in the insured property.  *Int'l Serv. Ins. Co. v. Gonzales*, 194 Cal. App. 3d 110, 117–118 (3rd Dist. 1987).  Like California, New York law also requires that the policyholder have an insurable interest.  *See, e.g.*, N.Y. Ins. Law § 3401 (insurable interest requirement); *Scarola v. Ins. Co. of N. Am.*, 31 N.Y.2d 411, 413 (1972) (insurable interest where one "will derive pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage from its destruction . . . .").

An insurable interest exists when the insured has a "direct pecuniary interest in the preservation of the property and will suffer a pecuniary loss as an immediate and proximate result of its destruction." *Gonzales*,  194 Cal. App. 3d at 118.  Bookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss, cannot support a claim for coverage from an insurance policy.  *See Fletcher Jones Co. v. United Pac. Ins. Co.*,

---

[24]    Plaintiffs also claim that that their Policy insures them for the "non-recoverable tax payments" they made.  (Ex. B ¶ 35.)  The SAC does not even allege that Plaintiffs made any "non-recoverable income tax payments."  Plaintiffs failure to "plead[] *factual content* that allows the court to draw the reasonable inference that the defendant is liable" is grounds for dismissal. *Iqbal*, 129 S. Ct. at 1949 (emphasis added).  In any event, in order for Plaintiffs to sustain a claim for their tax payments, if they made any, they would have to make the nonsensical allegation that Madoff perpetrated his fraud "in order to induce" them to pay taxes.  (Ex. A  at A-36.)  Only then could Plaintiffs meet the Policy requirement that the tax payments be "loss of money, securities, or other property … *resulting directly from fraud.* "  (*Id.* at A-37 (emphasis added).)  The SAC fails to allege that Madoff's misrepresentations were intended to induce Plaintiffs to make tax payments.  Even if it did, the claim fails as a matter of law because  "additional tax liability is a direct result of the tax laws."  *Blaney v. Int'l Ass'n of Machinists & Aerospace Workers,* 87 P.3d 757, 763–764 (Wash. 2004) (en banc) (holding in an employment discrimination case that "additional tax liability is too attenuated … to be deemed actual damages.").

181 Cal. App. 2d 202, 206 (2d Dist. 1960) (insurer is liable under fidelity bond "only to the extent the [insured] suffered an actual pecuniary loss").  This constitutes an independent basis for dismissal.

> **E.**     **Plaintiffs Fail To Allege That They Invested During the Alleged "Pre-Ponzi" Period Or That Some Of The Fictitious Profits Were Attributable To Securities Purchased During The Policy Period**

In their latest complaint, Plaintiffs allege that "there is some indication that BMIS did not start as a Ponzi scheme but gradually evolved into one over a period of time."  (Ex. B ¶ 36.) Plaintiffs seek a declaration that because "Defendants are unable to identify the date the BMIS Ponzi scheme started, [Defendants] cannot employ the loss methodology at issue because earnings and/or withdrawals before the Ponzi scheme started were all legitimate."  (Ex. B ¶ 80.) Plaintiffs' new Count Five for declaratory relief is contradicted by Plaintiffs' own allegations and must be dismissed.

As an initial matter, it is black-letter law that Plaintiffs, as the insured, bear "the burden … to bring the claim within the basic scope of coverage."  *See Waller*, 11 Cal. 4th at 16 (citations omitted); *see also R.A. Stuchbery & Others Syndicate 1096 v. Redland Ins. Co.*, 154 Cal. App. 4th 796, 801 (1st Dist. 2007) (quoting *Waller*).  They may not, through the artifice of a request for declaratory judgment, transfer that burden to the Defendants.

Second, the SAC utterly fails to allege facts sufficient to raise the Plaintiffs' right to relief "above the speculative level."  *Twombly*, 550 U.S. at 555.  Plaintiffs do not allege that a pre-Ponzi period existed.  Instead, they only go so far as to allege that "there is some indication" of such a period.  (Ex. B ¶ 36.)  Nor does the SAC allege an investment by Plaintiffs during the pre-Ponzi period.

Plaintiffs have not made concrete allegations that would support this latest theory because they cannot.  Plaintiffs have admitted that they did not invest with Madoff until 1997.  (Ex. B

¶ 11.)  They have already alleged in their original complaint that Madoff had been running a Ponzi scheme "since at least the early 1990s."  (Ex. C at ¶ 3.)[25]  Madoff himself testified at his plea hearing that "[t]o the best of my recollection, my fraud began in the early 1990s,"  (Ex. E at 25) as did his lieutenant, Frank DiPascali (Ex. M at 46).[26]  Thus, there can be no serious dispute that by 1997, the time Plaintiffs invested, any alleged "pre-Ponzi" period had ended and Madoff's criminal enterprise was underway.[27]

In addition to not alleging either the beginning of the Ponzi scheme or that they invested with Madoff before the fraud began, the SAC fails to allege that the hypothetical "pre-Ponzi" period would be material to the outcome of this case.  Plaintiffs received $225,769.45 more than they invested with Madoff.  The SAC fails to allege that Plaintiffs earned more than $225,769.45 on their investment during the pre-Ponzi period.  Without such an allegation, Plaintiffs' pre-Ponzi speculation is purely an academic endeavor.

In any event, the Policy was effective October 1, 2008 and only insures loss "during the

---

[25]  Although statements in superseded pleadings are not conclusive admissions, they remain admissions for evidentiary purposes.  *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984).

[26]  Exhibit M is a transcript of the defendant's guilty plea in *United States v. DiPascali*, No. 09-CR-764 (S.D.N.Y. Aug. 11, 2009).  It is entirely proper for the Court to take judicial notice of Madoff's and DiPascali's guilty pleas in deciding the motion to dismiss.  *See Global Network Commc'ns.*, 458 F.3d at 157.

[27]  Indeed, the only question is whether the Ponzi scheme began *before* the early 1990s. The government has consistently taken this position, and noted at Madoff's Allocution that the "government [did] not entirely agree with all of the defendant's descriptions" and that it would have proven that Madoff operated a Ponzi scheme "beginning at least as early as the 1980s." (Ex. E at 31-32).  *See also* Diana B. Henriques, *Start Date is Critical in Ponzi Plan*, N.Y. Times (Nov. 24 2009) ("[F]ederal prosecutors have consistently asserted that the entire Ponzi scheme was up and running "at least by the 1980s.").  And Judge Chin agreed with the government during Madoff's sentencing:  "Mr. Madoff argues in his reply letter that the fraud did not begin until the 1990s … but it is clear that the fraud began earlier.  (Ex. N at 43.)  Exhibit N is the transcript of the defendant's sentencing in *United States v. Madoff*, No. 09-CR-213 (S.D.N.Y. June 29, 2009).

policy period."  (Ex. A at A-37.)  Plaintiffs fail to allege that they suffered any insured loss in

2008.  Nor could they, as there is no credible basis to allege the Madoff made legitimate trades

during the time Plaintiffs were invested—let alone "during the Policy Period."[28]

## II.   PLAINTIFFS' CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING SHOULD BE DISMISSED AS A MATTER OF LAW BECAUSE THERE WAS NO BREACH OF CONTRACT

Plaintiffs' inability to allege that Defendants breached the insurance contract also

forecloses their claim for breach of the implied covenant of good faith and fair dealing.  (Ex. B

¶¶ 64-68.)  Under California law, there is no independent claim for the breach of the covenant of

good faith and fair dealing.  *Waller*, 11 Cal. 4th at 35–36 ("[B]ecause there was no contractual

liability on the part of [the defendant insurer], plaintiffs could not assert a valid [implied

covenant] claim . . . .  The covenant [of good faith] is implied as a supplement to the express

contractual covenants . . . .  Absent that contractual right . . . the implied covenant has nothing on

which to act as a supplement, and should not be endowed with an existence independent of its

contractual underpinnings." (internal quotation marks and citations omitted)).[29]

Where, as here, the insurer's claim denial was proper, the insured's claim for breach of

the covenant of good faith and fair dealing should be dismissed.  *See Griffen v. Allstate Ins. Co.*,

920 F. Supp. 127, 131 (C.D. Cal. 1996) ("Having no cause of action for breach of contract, the

---

[28]   The Policy is a renewal of an earlier policy issued to Plaintiffs.  Fraud SafeGuard coverage was not approved in California until August 30, 2007—Plaintiffs do not (and cannot) allege there were legitimate trades in any relevant period for which they *could* have had Fraud SafeGuard coverage.

[29]   Similarly, New York law does not recognize a separate cause of action for breach of implied covenant of good faith and fair dealing.  *See Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (Under New York law, "breach of [the] duty [of good faith and fair dealing] is merely a breach of the underlying contract." (internal quotation marks omitted)).

22

Griffins have no cause of action for breach of the implied covenant of good faith and fair dealing against Allstate . . . ."); *Gunderson v. Fire Ins. Exch.*, 37 Cal. App. 4th 1106, 1119 (1st Dist. 1995) ("Because there was no breach of the insurance contract, appellant's [implied covenant] claim also fails").

## III. PLAINTIFFS' CAUSE OF ACTION FOR UNJUST ENRICHMENT FAILS AS A MATTER OF LAW

"There is no cause of action in California for unjust enrichment." *Walker v. USAA Cas. Ins. Co.* 474 F. Supp. 2d 1168, 1174 (E.D. Cal. 2007) (quoting *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 794 (2d Dist. 2003)). California courts consider unjust enrichment to be synonymous with the remedy of restitution and not an independent cause of action. *Dinosaur Dev., Inc. v. White*, 216 Cal. App. 3d 1310, 1314–15 (1st Dist. 1989). Accordingly, Plaintiffs' cause of action for unjust enrichment should be dismissed as a matter of law.[30]

## IV. PLAINTIFFS' FOURTH AND SIXTH CAUSES OF ACTION FOR DECLARATORY RELIEF SHOULD BE DISMISSED AS REDUNDANT AND UNNECESSARY

Hoping to make some claim "stick," the SAC adds two causes of action that are duplicative of Plaintiffs' direct claims or Defendants' (as yet unasserted) affirmative defenses. Courts have broad discretion to dismiss declaratory judgment claims like these that are redundant of other claims. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1100 (2d Cir. 1993) ("A district court has broad discretion to decide whether to render a declaratory judgment.").

The Fourth Cause of Action seeks a declaration regarding the proper calculation of "loss"

---

[30] Similarly New York does not recognize a separate action for unjust enrichment "where there is a valid contract between the parties." *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 01 Civ. 2946 (DLC), 2004 WL 1944457 at *3 (S.D.N.Y. 2004); *see Maryland Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 212 (2d Cir. 2000) ("[u]njust enrichment applies where there is no contract between the parties. . ."); *Clark-Fitzpatrick, Inc. v. Long Island R.R.. Co.*, 70 N.Y.2d 382, 389 (1987) ("It is impermissible, however, to [claim unjust enrichment] where the suing party has . . . a valid written agreement.").

under the Policy and thus raises precisely the same issue as the First Cause of Action for breach of contract.  *See id.* at 1100 ("Where a district court has before it a declaratory judgment action and a direct action containing all of the issues in the declaratory judgment action, and decides the common issues in the direct action, it may exercise its discretion to dismiss the declaratory judgment complaint.").

Similarly, Plaintiffs' Sixth Cause of Action, seeks a "declaration that all applicable statutes of limitation and repose, and similar statutes, are tolled, and that all doctrines of laches, and similar doctrines, do not apply."  (Ex. B ¶ 83.)   As Defendants have not even asserted any affirmative defenses, this count is premature and, in any event. redundant of issues that would be properly raised by Defendants' answer.  *See, e.g., Arista Records LLC v. Usenet.com., Inc.*, No. 07 Civ. 8822, 2008 WL 4974823, at *4 (S.D.N.Y. Nov. 24, 2008) (dismissing counterclaims that failed to rest on "independent factual allegations" and "consist[ed] of the same legal assertions as those made in its defenses"); *Lee v. Park Lane Togs, Inc.*, 81 F. Supp. 853, 854 (S.D.N.Y. 1948) (dismissing defendant's counterclaim seeking declaration of invalidity of trademark as unnecessary where allegations of counterclaim were already before court as a defense).[31]

## CONCLUSION

For the reasons stated above, the SAC should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  Plaintiffs have already recouped all of the money they invested with Madoff, and their

---

[31]   In any event, the Horowitzes lack standing to pursue declaratory or injunctive relief. They have a fully ripe claim for money damages from their claim denial.  They have no immediate fear of being wronged again by the practices they seek to enjoin, so their claims fail as a matter of law.  *See, e.g., Wooden v. Bd. of Regents*, 247 F.3d 1262, 1284 (11th Cir. 2001) (plaintiff lacked standing to seek injunctive relief on behalf of a class because "the fact that others may be exposed to that process in the future is not sufficient for [plaintiff] to obtain prospective relief that will not benefit *him* in conjunction with his individual claim") (emphasis in original)); *Mixon v. Gray Drug Stores, Inc.,* 81 F.R.D. 413, 414 (N.D. Ohio 1978).

ever-shifting alternative arguments cannot overcome the plain language of the Policy—even if amended.  Plaintiffs have already had three opportunities to plead a viable case, and it is clear that they cannot do so.  Accordingly, Defendants respectfully request that the dismissal be with prejudice.

DATED:    New York, New York
          January 22, 2010

                              QUINN EMANUEL URQUHART OLIVER &
                                  HEDGES, LLP


                              By:   /s/ Michael B. Carlinsky
                                  Michael B. Carlinsky (Bar No. MC-6594)
                                  Jane M. Byrne (Bar No. JB-6748)


                              51 Madison Avenue, 22nd Floor, New York,
                              New York  10010-1601
                              (212) 849-7000
                              michaelcarlinsky@quinnemanuel.com
                              janebyrne@quinnemanuel.com

                              *Attorneys for Defendants*