**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT and HARLENE HOROWITZ, On Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> AMERICAN INTERNATIONAL GROUP, INC., AMERICAN INTERNATIONAL INSURANCE COMPANY OF CALIFORNIA, INC., AIU HOLDINGS, INC. (NOW KNOWN AS CHARTIS INC.), CHARTIS INC., AIG PRIVATE CLIENT GROUP, AIU HOLDINGS LLC (ALSO KNOWN AS CHARTIS INTERNATIONAL, LLC), AIG PROPERTY CASUALTY GROUP, INC. (NOW KNOWN AS CHARTIS INC.), and JOHN DOES 1-49, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Case No. 09 Civ. 7312 (PAC) (THK) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE CHARTIS DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

MILBERG LLP
BRAD N. FRIEDMAN
JENNIFER L. YOUNG
JOSHUA E. KELLER
One Pennsylvania Plaza
New York, New York 10119-1065
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
E-mail: bfriedman@milberg.com
      jyoung@milberg.com
      jkeller@milberg.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ..........................................................................................3

    **A.**    The Madoff Fraud ...................................................................................3

    **B.**    The Madoff Bankruptcy...........................................................................4

    **C.**    The Policy Endorsement and Defendants' Denial of Plaintiffs' Claim.........................................................................................................5

ARGUMENT .............................................................................................................6

    I.    STANDARD OF REVIEW ......................................................................6

    II.    THE MOTION TO DISMISS MUST BE DENIED BECAUSE THE POLICY AND ENDORSEMENT DO NOT CLEARLY AND UNAMBIGUOUSLY SUPPORT DEFENDANTS' INTERPRETATION ...........7

        **A.**    The Motion Must Be Denied Unless The Policy and Endorsement Clearly and Unambiguously Support Defendants' Interpretation ...............7

        **B.**    If There Is An Ambiguity, Defendants' Motion Must Be Denied..............8

        **C.**    Read As A Whole Or Otherwise, The Policy and Endorsement Do Not Clearly And Unambiguously Support Defendants' Interpretation of the Insuring Provisions ...................................................9

            **1.**    Plaintiffs Suffered A "Loss" ..........................................................9

            **2.**    Plaintiffs' Loss Resulted "Directly" from Fraud ...........................12

            **3.**    Plaintiffs "Parted With Something of Value" ................................16

            **4.**    Plaintiffs' Loss Included Non-Recoverable Tax Payments...........16

        **D.**    Read As A Whole Or Otherwise, The Exclusions Do Not Clearly And Unambiguously Support Defendants' Interpretation ........................17

        **E.**    Any "Netting" Approach Must Utilize Constant Dollars ..........................19

        **F.**    In Addition, Any "Netting" Analysis Cannot Begin On Day One ............20

            **1.**    "Netting" Cannot Precede Endorsement Inception........................20

          2.      "Netting" Also Cannot Precede The Unknown Start Date (and Other Details of the Scheme) With Respect To Each Account ................................................................................20

     **G.**     Plaintiffs Have An Insurable Interest.........................................22

III.    PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.........................................................................................22

IV.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED AN UNJUST ENRICHMENT CLAIM ...................................................................23

V.    PLAINTIFFS' FOURTH AND SIXTH CAUSES OF ACTION FOR DECLARATORY RELIEF ARE PROPERLY PLED.........................................24

CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexsey v. Kelly,*
  205 A.D.2d 650 (2d Dep't 1994) ..........................................................................................16

*Am. Alternative Ins. Corp. v. Super. Ct.,*
  135 Cal. App. 4th 1239 (2006) ............................................................................................10

*Am. Tel. & Util. Consultants, Inc. v. Beth Isr. Med. Ctr.,*
  307 A.D.2d 834 (1st Dep't 2003) ........................................................................................23

*Am. Trust & Sav. Bank v. U.S. Fid. & Guar. Co.,*
  418 N.W.2d 853 (Iowa 1988) ..............................................................................................19

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009) ...........................................................................................................7

*Bank of N.Y. Trust, N.A. v. Franklin Advisors, Inc.,*
  522 F. Supp. 2d 632 (S.D.N.Y. 2007) ...................................................................................7

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................................6

*Blaney v. International Ass'n,*
  87 P.3d 757 (Wash. 2004) ....................................................................................................17

*Broadview Chem. Corp. v. Loctite Corp.,*
  474 F.2d 1391 (2d Cir. 1973) ...............................................................................................24

*Cal. Food Serv. Corp., Inc. v. Great Am. Ins. Co.,*
  130 Cal. App. 3d 892 (1982) ...............................................................................................22

*Ceramicas Industriales, S.A. v. Metro. Life Ins. Co.,*
  2009 U.S. Dist. LEXIS 10203 (S.D.N.Y. Feb. 11, 2009) ....................................................7

*Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co.,*
  2007 U.S. Dist. LEXIS 96529 (S.D. Ga. 2007) .............................................................14, 15

*Conley v. Gibson,*
  355 U.S. 41 (1957) ..................................................................................................................6

*Cotton v. Provident Life & Cas. Ins. Co.,*
  951 F. Supp. 395 (E.D.N.Y. 1997) .....................................................................................8, 9

*County of Columbia v. Cont'l Ins. Co.,*
  83 N.Y.2d 618 (1994) ...........................................................................................................20

*David v. Am. Home Assur. Co.*,
    1997 U.S. Dist. LEXIS 4177 (S.D.N.Y. 1997) ...................................................................17

*Dream Spa, Inc. v. Fireman's Fund Ins.*,
    2008 U.S. Dist. LEXIS 8933 (S.D.N.Y. 2008) ...................................................................24

*Everhart v. Drake Mgmt., Inc.*,
    627 F.2d 686 (5th Cir. 1980) ...........................................................................................15

*FDIC v. United Pacific Ins. Co.*,
    20 F.3d 1070 (10th Cir. 1994) .........................................................................................14

*Fidelity & Deposit Co. of Maryland v. USAForm Hail Pool, Inc.*,
    463 F.2d 4 (5th Cir. 1972) ...............................................................................................14

*First Nat'l Bank of Dillonvale v. Progressive Cas. Ins. Co.*,
    640 N.E.2d 1147 (Ohio Ct. App. 1993)...........................................................................13

*Foy v. D.B. Frame Shop., Ltd.*,
    210 A.D.2d 162 (1st Dep't 1994) .....................................................................................10

*Freedman v. Queen Ins. Co.*,
    56 Cal. 2d 454 (1961) ......................................................................................................18

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
    2009 U.S. Dist. LEXIS 104774 (S.D.N.Y. Nov. 4, 2009).................................................25

*Garamendi v. Mission Ins. Co.*,
    131 Cal. App. 4th 30 (2005) ..............................................................................................8

*Gen. Star Indem. Co. v. Custom Editions Upholstery Corp.*,
    940 F. Supp. 645 (S.D.N.Y. 1996) .....................................................................................8

*Ghirardo v. Antonioli*,
    14 Cal. 4th 39 (1996) .......................................................................................................23

*Glassalum Int'l Corp. v. Albany Ins. Co.*,
    2005 U.S. Dist. LEXIS 9767 (S.D.N.Y. 2005) ................................................................10

*Gross v. Empire Healthchoice Assurance, Inc.*,
    2007 N.Y. Misc. LEXIS 4962 (Sup. Ct. N.Y. County 2007) ..........................................22

*Haber v. St. Paul Guardian Ins. Co.*,
    137 F.3d 691 (2d Cir 1998).................................................................................................8

*In re New Times Sec. Servs., Inc.*,
    371 F.3d 68 (2d. Cir. 2004)..............................................................................................15

*Iron Mountain Sec. Storage Corp. v. Am. Specialty Foods, Inc.*,
    457 F. Supp. 1158 (E.D. Pa. 1978) ................................................................25

*J.J.J. Props., Inc. v. Travelers Indem. Co.*,
    2008 U.S. Dist. LEXIS 51992 (S.D.N.Y. 2008) ..........................................24

*Jackson v. Ramundo*,
    1997 U.S. Dist. LEXIS 17035 (S.D.N.Y. 1997) ..........................................21

*Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*,
    187 A.D.2d 225 (1st Dep't 1993) .................................................................23

*Lambros v. Metro. Life Ins. Co.*,
    111 Cal. App. 4th 43 (2003) ...........................................................................7

*Lang v. Hanover Ins. Co.*,
    787 N.Y.S.2d 211 (N.Y. 2004) .....................................................................24

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    41 A.D.3d 269 (1st Dep't 2007) ...................................................................23

*McCarthy v. Am. Int'l Group*,
    283 F.3d 121 (2d Cir. 2002) .............................................................................7

*Mostow v. State Farm Ins. Cos.*,
    88 N.Y.2d 321, 326-27 (1996) ........................................................................8

*Omni Berkshire Corp. v. Wells Fargo Bank, N.A.*,
    307 F. Supp. 2d 534 (S.D.N.Y. 2004) ..........................................................10

*OTC Int'l, Ltd. v. All Those Underwriters at Lloyd's of London Subscribing to Policy of
    Ins. Numbered HN99ABXC255*, 781 N.Y.S.2d 626, 2004 N.Y. Misc. LEXIS 49 (N.Y.
    Sup. Ct. Queens County 2004) ...........................................................10, 21, 24

*Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*,
    472 F.3d 33 (2d Cir. 2006) .......................................................................8, 17

*Penna v. Fed. Ins. Co.*,
    28 A.D.3d 731 (2d Dep't 2006) ....................................................................20

*Puget Sound Nat'l Bank v. St. Paul Fire & Marine Ins. Co.*,
    645 P.2d 1122 (Wash. Ct. App. 1982) ..........................................................13

*Riley v. Mid-Century Ins. Exch.*,
    118 Cal. App. 3d 195 (1981) .........................................................................22

*Royal Ins. Co. of Am. v. Ru-Val Elec. Corp.*,
    1996 U.S. Dist. LEXIS 3094 (E.D.N.Y. 1996) ............................................17

*Scarola v. Ins. Co. of N. Am.*,
    31 N.Y.2d 411 (1972) ...............................................................................22

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ...................................................................11

*Seaboard Sur. Co. v. Gillette Co.*,
    64 N.Y.2d 304 (1984) ..............................................................................17

*SEC v. Byers*,
    637 F. Supp. 2d 166 (S.D.N.Y. 2009) ....................................................14

*St. Paul Fire & Marine Ins. Co. v. Branc Bank & Trust Co.*,
    643 F. Supp. 648 (E.D.N.C. 1986) .........................................................13

*St. Paul Fire & Marine Ins. Co. v. Branch Bank & Trust Co.*,
    834 F.2d 416 (4th Cir. 1987) ............................................................13, 17

*Stainless, Inc. v. Employers Fire Ins. Co.*,
    69 A.D.2d 27 (1st Dep't 1979), *aff'd*, 49 N.Y.2d 924 (1980) ................8

*State Farm Mut. Auto. Ins. Co. v. Super. Ct.*,
    123 Cal. App. 4th 1424 (2004) ...............................................................23

*U.S. v. Treadwell*,
    2010 U.S. App. LEXIS 1924 (9th Cir. Jan. 28, 2010) ............................12

*Union Planters Bank, N.A. v. Cont'l Cas. Co.*,
    478 F.3d 759 (6th Cir. 2007) ..................................................................13

*Univ., Patents, Inc. v. Kligman*,
    1991 U.S. Dist. LEXIS 11917 (E.D. Pa. 1991) .....................................25

*Vargas v. Ins. Co. of N. Am.*,
    651 F.2d 838 (2d Cir. 1981)......................................................................8

*Visconsi v. Lehman Bros., Inc.*,
    244 Fed. Appx. 708 (6th Cir. 2007).................................................14, 15

*Warney v. Monroe County*,
    587 F.3d 113 (2d Cir. 2009)......................................................................6

*Wesley v. Muhammad*,
    2008 U.S. Dist. LEXIS 3136 (S.D.N.Y. 2008) .......................................7

**STATUTES**

15 U.S.C. § 78lll(11)..................................................................................4

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a)(2) ...........................................................................................6

Fed. R. Civ. P. 57 ..................................................................................................24

*American Heritage College Dictionary* ................................................................13

*Black's Law Dictionary* 1029-1030 (9th ed. 2009) ...............................................10

*Merriam-Websters' Collegiate Dictionary* 736 (11th ed. 2003) ............................10

http://www.bls.gov/data/inflation_calculator.htm .................................................19

http://www.moneychimp.com/articles/finworks/fmfutval.htm .................................18

Plaintiffs Robert and Harlene Horowitz ("Plaintiffs") respectfully submit this Memorandum of Law, together with the Declaration of Brad N. Friedman ("Friedman Decl."), in Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC").

## PRELIMINARY STATEMENT

Plaintiffs are two of the many victims of Bernard L. Madoff's ("Madoff") Ponzi scheme. Plaintiffs, like many other such victims, held a customer account with Bernard Madoff Investment Securities, LLC ("BMIS").[1]  To protect their assets, Plaintiffs purchased a homeowners' insurance policy (the "Policy") containing a Fraud SafeGuard endorsement (the "Endorsement").  This Endorsement covered Plaintiffs "for loss of money, securities, or other property," up to a limit of $30,000.  The Endorsement defined the terms "money" and "securities," and Defendants do not contest that Madoff victims had money or securities with Madoff; to the contrary, Defendants contend that they have paid many Madoff-related claims.

Rather, Defendants' primary contention on this motion is that *these* Plaintiffs, and other similarly situated Madoff victims, have not suffered a "loss" because, over time, and before the scheme's collapse, they withdrew more money from their customer accounts than they deposited out of pocket, and/or that the Endorsement expressly excludes "income" as an indirect loss. However, the Endorsement terms critical to Defendants' analysis – terms such as "loss" and "income" –  are wholly undefined in the standard form contract that Defendants drafted and for which Defendants collected premiums.  As commonly understood, Plaintiffs lost the entire balance set forth on their final account statement, which was over $8.5 million.

Until the Ponzi scheme fell apart, the full $8.5 million was available to Plaintiffs to

---

[1] Defendants inaccurately and prejudicially refer to Plaintiffs as "investors."  That is wrong. Plaintiffs had brokerage accounts with BMIS, and were "customers," not investors.  Plaintiffs were no more BMIS investors than a person with a brokerage account at Merrill Lynch is a Merrill Lynch investor.  Even the parties to the bankruptcy, discussed below, concede this fact.

withdraw upon request.  Plaintiffs, like many Madoff victims, were able to – and did – withdraw more than they deposited:  indeed, this is the reason Defendants assert they have no loss. Plaintiffs innocently and reasonably relied on the balance set forth on their account statements, and treated the balance as their own.  For all purposes, until December 2008, the amount shown on the final account statement was theirs.  Plaintiffs received 1099 Forms on the reported gains, which plainly had accrued and become an asset, *and were no longer income*, by the time the scheme collapsed.  Often the reason Plaintiffs withdrew funds was to pay taxes on such gains.

The balances shown on the final account statements, including the *accrued* gains, were lost when the Ponzi Scheme collapsed.  Quite literally, one day millions of dollars were available for withdrawal, and the next day those funds were gone.  If that is not a "loss" that resulted "directly" from fraud, it is hard to imagine what is.  Under these facts and under well-established rules of contract construction that strongly favor the insured and disfavor the drafter of such form insurance contracts, especially where there is ambiguity, Plaintiffs are entitled to coverage (up to the Endorsement limit) for the balance reflected on their final account statement.

Defendants should not now be permitted to avoid the coverage obligations for which they collected premiums by belatedly creating narrow definitions that are missing from the Policy and the Endorsement.  Moreover, even if Defendants' interpretation was correct – and it is not – Plaintiffs and the Class still are entitled to relief for at least three additional reasons.

First, Defendants' "netting out" of withdrawals against deposits must be calculated using constant dollars, in order to take "into account the economic reality that a dollar invested in 2008 has a different value than a dollar invested" in 1997.  *See* SEC Memorandum of Law, Defs.' Ex.

L, at 1.[2]  This is particularly true where, as here, the deposits and withdrawals spanned decades.

Second, any netting out of withdrawals may only begin after Endorsement inception. Even if gains are still considered "income" many years after they become an accrued asset (*i.e.*, part of principal) – and clearly this is not the case – it nevertheless remains the case that, at the time of inception, Defendants agreed to insure Plaintiffs' assets as they then existed; thus, any netting out may only begin, if at all, after inception of the Endorsement.

Third, any netting of losses also cannot precede the unknown start date of the scheme with respect to Plaintiffs' account, which may have had legitimate gains before it became part of the scheme.  It also cannot precede knowing other details of the scheme, such as whether certain gains were legitimate as a result of transfers to the legitimate portions of Madoff's businesses.

Thus, there is an obvious need for a judicial determination of the correct interpretation of the Policy and Endorsement language (and missing definitions) at issue.  As discussed herein, any way one looks at it, Plaintiffs (and many other policyholder victims) are entitled to coverage.

## STATEMENT OF FACTS

### A.    The Madoff Fraud

For over ten years, Plaintiffs deposited money, withdrew money, and paid taxes on gains based on their account statements. SAC ¶¶ 11, 35.  Plaintiffs received "written confirmations and account statements based on real, well-known, and publicly verifiable securities."  SAC ¶ 33.

In December 2008, Madoff admitted that his investment advisory business was a fraud, estimating "losses from this fraud to be approximately $50 billion."  SAC ¶ 27.  As a result, Plaintiffs and others lost the balances reflected on their final account statements.  *Id.* ¶ 30. Plaintiffs' final statement reflected a balance of over $8.5 million.  *Id.*

---

[2] References to "Defs.' Ex. __ " refer to Exhibits annexed to the Declaration of Michael B. Carlinsky, submitted with Defendants' Motion.

On March 12, 2009, Madoff pled guilty to 11 counts of a criminal information that included charges of securities fraud. *Id.* ¶ 29.  According to Madoff, "[w]hen clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds." Defs.' Ex. E, at 24.

## B.        The Madoff Bankruptcy

Upon discovery of Madoff's Ponzi scheme, BMIS was placed into bankruptcy and a bankruptcy trustee, Irving Picard (the "Trustee"), was appointed.  Madoff victims who file claims in the bankruptcy are entitled to recoveries from two different sources.  First, they are entitled to up to $500,000 from the Securities Investor Protection Corporation ("SIPC") pursuant to the Securities Investor Protection Act ("SIPA").  Second, they are entitled to a *pro rata* share of any funds in the BMIS bankruptcy estate at the conclusion of the bankruptcy.

Madoff victims' entitlement to relief from these two sources is based on a statutory definition of "net equity" that is very different from anything that is even remotely relevant to the contract at issue here, including the undefined terms "loss" and "income."  *See* 15 U.S.C. § 78lll(11).  The issue of how "net equity" is calculated pursuant to this statutory provision is hotly contested, has been briefed by numerous parties, is *sub judice* in the bankruptcy court, and for the most part is not relevant here.  Two aspects of this dispute do, however, bear mention.

First, as noted above, the SEC submitted a brief to the bankruptcy court which, although mostly supporting the Trustee, also argued that "customer claims . . . should be calculated in constant dollars."  SAC ¶ 35; *see* Defs.' Ex. L, at 1.

Second, with respect to the $500,000 that SIPC provides, the dispute largely revolves around whether what SIPC provides is properly considered "insurance" or an "advance."  SIPC and the Trustee argue that SIPC merely provides an advance on the ultimate bankruptcy

4

recovery, and not insurance. Whatever the merits of this argument, it is clear that SIPC and the Trustee believe that "insurance," by contrast, *would* cover the full amount of the last account statement (up to $500,000). *See* Friedman Decl., Ex. A, at 16-18.

### C.     The Policy Endorsement and Defendants' Denial of Plaintiffs' Claim

Defendants sold Plaintiffs and others a homeowner's insurance policy, which Defendants drafted, that included an Endorsement for Fraud SafeGuard coverage. SAC ¶ 24; Defs.' Ex. A, at A-36. Fraud SafeGuard coverage, as described in AIG's marketing materials, secures policyholders' "important assets," such as "money, securities, personal property, jewelry and collectibles" against "today's sophisticated criminals and new risks." SAC ¶ 25.

Plaintiffs paid premiums for Fraud SafeGuard coverage with a $30,000 limit for each "Fraud SafeGuard event." *Id.* ¶¶ 7, 26. Under the Endorsement, a "Fraud Safe[G]uard event means fraud, embezzlement, or forgery." Defs.' Ex. A, at A-36. The Endorsement defines fraud or embezzlement as, among other things, "[a]ny . . . intentional perversion of truth ... perpetrated in order to induce you ... to part with something of value." *Id.* Defendants admit that the Madoff Ponzi scheme was a Fraud SafeGuard event and have paid hundreds of claims for Madoff-related losses under policies with Fraud SafeGuard coverage. SAC ¶ 42.

In December 2008, Plaintiffs submitted a claim to Defendants for their losses resulting from the Madoff fraud. Defs.' Ex. H. On February 18, 2009, Defendants responded by denying coverage. SAC ¶ 31. This denial was based on Defendants' determination that Plaintiffs' "withdrawals from the investment account(s) exceed[ed] the amount of [their] capital contributions" and "[a]ny alleged gains, growth, or appreciation of [Plaintiffs'] capital contribution are the subject of the Madoff fraud scheme and are not covered by the Policy." Defs.' Ex. H.

Yet in the Endorsement, Defendants agreed, in the event of a fraud, that:

5

- they would "pay ... for loss of **money, securities, *or* other property** ... resulting directly from **fraud** ... "; Defs' Ex. A at A-37 (emphasis in original);

- "[t]he most [they] will pay each insured for *all loss* resulting from **fraud, embezzlement, or forgery** is the Fraud, Embezzlement, or Forgery Each Insured Aggregate Limit shown in the schedule." *Id.* at A-39 (italics with bolding added; bolding without italics in original); and

- "[t]he most [they] will pay for *any loss* is the applicable Limit of Insurance." *Id.* (emphasis  added).

Despite this obligation to pay for "loss," "any loss," and "all loss," Defendants applied their strict cash in/cash out approach and denied Plaintiffs' claim for essentially two reasons:

*First*, Defendants assert that Plaintiffs "have not experienced a loss of money under the Policy or the AIG Fraud SafeGuard Coverage Endorsement." *See* Defs.' Ex. H, at H-1-3.  Yet, Defendants do not define "loss," "any loss," or "all loss."

*Second*, Defendants assert that Plaintiffs' claim is expressly excluded because Plaintiffs purportedly are seeking coverage for the "inability to realize income [Plaintiffs] would have realized had there been no loss or damage to money, securities, or other property." *See* Defs' Ex. H, at H-2.  Yet, Defendants do not define "income," either.

## ARGUMENT

## I.    STANDARD OF REVIEW

In determining whether a plaintiff has pled a claim, "all well-pled factual allegations [are taken as true] and ... all reasonable inferences [are drawn] in the plaintiff's favor." *See Warney v. Monroe County*, 587 F.3d 113, 116 (2d Cir. 2009).  Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order 'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).[3]

## II.    THE MOTION TO DISMISS MUST BE DENIED BECAUSE THE POLICY AND ENDORSEMENT DO NOT CLEARLY AND UNAMBIGUOUSLY SUPPORT DEFENDANTS' INTERPRETATION

### A.    The Motion Must Be Denied Unless The Policy and Endorsement Clearly and Unambiguously Support Defendants' Interpretation

Defendants' Motion cannot be granted unless the contract language clearly and unambiguously supports their strained interpretation of terms such as "loss," "any loss," "all loss," and "income." *See Ceramicas Industriales, S.A. v. Metro. Life Ins. Co.*, 2009 U.S. Dist. LEXIS 10203, at *6 (S.D.N.Y. Feb. 11, 2009) (denying motion to dismiss where contract terms were ambiguous);[4] *Bank of N.Y. Trust, N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("The [c]ourt's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities."); *McCarthy v. Am. Int'l Group*, 283 F.3d 121, 124 (2d Cir. 2002) ("New York follows the well established *contra proferentem* principle which requires that 'equivocal contract provisions are generally to be construed against the drafter.'").[5]

---

[3] Defendants exert much effort parsing superseded complaints in this case. However, "[a]n allegation in a complaint that has been superseded by an amended pleading is not a binding and conclusive judicial admission, and hence is relevant only in a fact-finding proceeding in which the pleader's credibility may be called into question." *Wesley v. Muhammad*, 2008 U.S. Dist. LEXIS 3136, at *12-13 & n.6 (S.D.N.Y. 2008) (Second Circuit has rejected the view that earlier complaints remain binding or may be considered on a motion to dismiss).

[4] As discussed in further detail in Plaintiffs' Opposition to Defendants' Motion to Strike Plaintiffs' Class Allegations, New York law controls. In any event, Defendants agree that there are no state law differences between New York and California. *See, e.g.*, Defs.' Mot. at 19.

[5] California law is the same. *See Lambros v. Metro. Life Ins. Co.*, 111 Cal. App. 4th 43, 49 (2003) ("ambiguities [in an insurance contract] must be construed against the drafter").

**B.      If There Is An Ambiguity, Defendants' Motion Must Be Denied**

"Under New York law, ambiguous language should be construed in accordance with the reasonable expectations of the insured[s] when [they] entered the contract." *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 697 (2d Cir 1998); *Stainless, Inc. v. Employers Fire Ins. Co.*, 69 A.D.2d 27, 33 (1st Dep't 1979) ("[S]ince the policy is drawn by the insurer, it is to be liberally construed in favor of the insured"), *aff'd*, 49 N.Y.2d 924 (1980).[6]  Moreover, "the insurer bears a heavy burden of proof, for it must …'show (1) that it would be unreasonable for the average man reading the policy to (construe it as the insured does) and (2) that its own construction was the only one that fairly could be placed on the policy.'" *Vargas v. Ins. Co. of N. Am.*, 651 F.2d 838, 839-40 (2d Cir. 1981) (citations omitted).[7]

"The test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy … and employing common speech." *Gen. Star Indem. Co. v. Custom Editions Upholstery Corp.*, 940 F. Supp. 645, 654 (S.D.N.Y. 1996) (citing *Mostow v. State Farm Ins. Cos.*, 88 N.Y.2d 321, 326-27 (1996)).  To determine whether any ambiguity exists, the policy must be read as a whole. *See Cotton v. Provident Life & Cas. Ins. Co.*, 951 F. Supp. 395, 398 (E.D.N.Y. 1997).

---

[6] California law is no different.  *See Garamendi v. Mission Ins. Co.*, 131 Cal. App. 4th 30, 42 (2005) ("Ambiguous coverage clauses are to be interpreted to 'protect the objectively reasonable expectations of the insured.'") (citations omitted).

[7] At most, and purely in theory, *on a motion for summary judgment* Defendants might be allowed to introduce extrinsic evidence to show that the insurance contract is unambiguous in their favor. *See Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42-43 (2d Cir. 2006).  However, in a non-negotiated "form contract" case such as this, it is difficult to imagine how this would be possible.  To the contrary, it is Plaintiffs who may wish to use extrinsic evidence, for example, to show that Defendants have paid similar claims in the past.

8

C.    **Read As A Whole Or Otherwise, The Policy and Endorsement Do Not Clearly And Unambiguously Support Defendants' Interpretation of the Insuring Provisions**

Here, the insurance contract clearly and unambiguously supports Plaintiffs' coverage position.  Alternatively, viewed from the standpoint of the reasonable expectations of an average insured reading the Policy and Endorsement as a whole, it is clear that the provisions at worst are ambiguous, and therefore must be construed in favor of the insured.

The Endorsement purports to insure policyholders against a "Fraud Safe[G]uard event." Defs.' Ex. A, at A-36.    Under the Endorsement, a "Fraud Safe[G]uard event means fraud, embezzlement, or forgery."  *Id.*  The Endorsement defines fraud or embezzlement as, among other things, "[a]ny . . . intentional perversion of truth … perpetrated in order to induce you … to part with something of value."  *Id.*  The Endorsement also provides that it will pay for "loss of money, securities, or other property up to the applicable Limits of Insurance . . . resulting directly from fraud, embezzlement, or forgery. . . ."  *Id.* at A-37.  However, *neither* the Policy *nor* the Endorsement define the term "loss."  Nor do they define the terms "direct" or "directly."[8]

1.    **Plaintiffs Suffered A "Loss"**

Defendants strain to argue that Plaintiffs clearly and unambiguously have not suffered a "loss" because they withdrew more money than they deposited, and any historic gains must be ignored.  Defendants find this clarity even though, up until the very last moment, Plaintiffs could have withdrawn the entirety of the $8.5 million on their final account statement.  Defendants also find this clarity even if the withdrawals were made long ago for legitimate purposes, even if Plaintiffs' reliance on the gains was objectively reasonable, and even if Plaintiffs paid taxes on

---

[8] The "Exclusions" section the Endorsement does define the phrase "Indirect Loss."  However, as explained *infra* at Point II.D, the definition of the phrase "Indirect Loss" (which includes several defined terms) turns on the meaning of the *undefined* term "income."

the reported gains.  And Defendants find this clarity even though, unlike most insuring agreements, the word "loss" is never actually defined – anywhere.  Defendants are wrong.

*First*, numerous courts have held that the failure to define key policy terms renders a policy ambiguous as a matter of law.  *See, e.g., Glassalum Int'l Corp. v. Albany Ins. Co.*, 2005 U.S. Dist. LEXIS 9767, at *21 (S.D.N.Y. 2005) (Chin, J.) (policy terms ambiguous because they were undefined); *Omni Berkshire Corp. v. Wells Fargo Bank, N.A.,* 307 F. Supp. 2d 534, 540 (S.D.N.Y. 2004) (agreement ambiguous because it leaves key terms undefined).[9]

Of particular relevance here, courts have found that the failure to define the specific term "loss," creates an ambiguity in an insurance contract.  *See Foy v. D.B. Frame Shop., Ltd.,* 210 A.D.2d 162 (1st Dep't 1994) (affirming denial of motion for summary judgment because "loss" not defined in contract); *OTC Int'l, Ltd. v. All Those Underwriters at Lloyd's of London Subscribing to Policy of Ins. Numbered HN99ABXC255,* 781 N.Y.S.2d 626, 2004 N.Y. Misc. LEXIS 49, at *3 (N.Y. Sup. Ct. Queens County 2004) (insurance contract ambiguous because it failed to define "loss").

*Second*, ignoring that the term "loss" is not defined in the contract, a simple dictionary definition includes "losing possession," "deprivation," and "the harm or privation resulting from loss or separation."  *Merriam-Websters' Collegiate Dictionary* 736 (11th ed. 2003).  *Black's Law Dictionary* defines "loss" as a "disappearance or diminution of value" and "[t]he amount of financial detriment caused by an insured property's damage."  *Black's Law Dictionary* 1029-1030 (9th ed. 2009).  Black's defines "direct loss" as a loss "that results immediately and proximately from an event."  *Id.* at 1030.  Any common understanding of the phrase, "loss of

---

[9] California law is to similar effect.  *See Am. Alternative Ins. Corp. v. Super. Ct.,* 135 Cal. App. 4th 1239, 1247 (2006) ("'[I]n an appropriate case, the absence of a policy definition, though perhaps not dispositive, might weigh, even strongly, in favor of finding an ambiguity.'").

money, securities, or other property … resulting directly from fraud," therefore, would have to include the loss of millions of dollars reflected on a statement, on which taxes had been paid, which had been withdrawn without issue in the past, and which were capable of being withdrawn up until the moment the Ponzi scheme collapsed.  As Madoff himself said, "[w]hen clients wished to receive profits they believed they had earned with me or to redeem their principal, I used the money in the . . . bank . . . to pay the requested funds."  Defs.' Ex. E, at 24.

*Third*, Defendants agreed to cover "any loss," and "all loss," up to the coverage limit. Thus, Defendants created the reasonable expectation that any and all loss relating to the amounts shown on Plaintiffs' final account statements would be covered up to the Endorsement limit.

*Fourth,* the Endorsement provided for coverage when Plaintiffs "parted with something of value," which clearly occurred when Plaintiffs lost their previous ability to withdraw the amounts reflected on their account statements.[10]  Defendants' subsection arguing that Plaintiffs did not part with something of value, Def. Mot. at 18, is, therefore, simply wrong.

*Fifth*, the Endorsement provides that Defendants "will not be liable for *more than* the actual cash value of the securities at the close of business on the business day preceding the day on which the loss was discovered."  Defs.' Ex. A, at A-41 (emphasis added).  This necessarily means that Defendants are liable for *up to* the cash value of the securities shown on Plaintiffs' final account statement, subject to coverage limits.

---

[10] Defendants cite to *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995), to purportedly support their argument that the undefined Endorsement phrase, "part with something of value," does not apply to the amounts shown on Plaintiffs' final account statements.  *Scholes* is inapplicable here because it addressed a state fraudulent conveyance statute, not an insured's rights under an insurance contract.  *Id*. at 753.  Furthermore, in *Scholes*, Judge Posner noted that it would be unjust to permit profits to be retained *at the expense of other defrauded investors*.  *Id*. at 757.  In other words, *Scholes* involved a zero-sum game among the various investors.  Here, by contrast, insurance coverage for one Madoff victim will not in any way diminish or reduce insurance coverage for any other Madoff victim.  Defendants must provide full coverage, up to coverage limits, to all of their insureds.

11

*Sixth*, it continues to be the common understanding, including of many courts, that the Madoff Ponzi scheme resulted in losses of over $50 billion to Madoff customers.[11]  This common understanding is based on the fact that the amounts reflected on Madoff customers' final account statements totaled over $50 billion.[12]  *See* Defs.' Ex. F, at 8.

Clearly, then, Plaintiffs have suffered a "loss."  At an absolute minimum, with so much public confusion over whether losses include the reported gains, and with litigation over this issue in various contexts (such as in the bankruptcy court), and an insurance contract that does not clearly provide otherwise, there is an ambiguity sufficient to allow Plaintiffs to obtain discovery on issues such as what Defendants covered in other Ponzi schemes (or indeed, whether this situation has ever previously arisen); internal communications on this issue (if any); and communications with (and within) the Insurance Services Organization ("ISO"), which is the entity that Plaintiffs believe drafted (in whole or substantial part) the language at issue.

### 2.    Plaintiffs' Loss Resulted "Directly" from Fraud

Defendants also attempt to support their after-the-fact interpretation by arguing that the undefined Endorsement term, "directly," clearly and unambiguously means that Plaintiffs cannot recover "expected profits that [they] could have earned had the Madoff account[] statements

---

insurance coverage for any other Madoff victim.  Defendants must provide full coverage, up to coverage limits, to all of their insureds.

[11] *See U.S. v. Treadwell*, 2010 U.S. App. LEXIS 1924, at *2-3 n.2 (9th Cir. Jan. 28, 2010) ("the 2008 collapse of Bernard 'Bernie' Madoff's grandiose Ponzi scheme resulted in over $50 billion in investor losses").

[12] An example set forth in the SAC illustrates why Plaintiffs' expectation of coverage is entirely reasonable.  If an individual deposited $10,000 in an FDIC-insured bank in 1996, and by 2009, that individual earned $7,000 in interest and then withdrew $11,000, that individual would have an account balance of $6,000.  SAC ¶ 9.  If the bank then failed for any reason, including fraud by the bank president, the FDIC would pay that individual for his or her $6,000 loss.  *Id.*  No one would say the individual "profited," as Defendants argue here, because the individual withdrew more money than he or she deposited.  *Id.*

First, as with the term "loss," the term "directly" is not defined anywhere, thus dooming Defendants' argument at the outset. Certainly, an average reasonable policyholder, using any standard dictionary, would understand that Plaintiffs' losses resulted directly from the fraud.[13]

Second, there is ample authority illustrating that the loss of the balances set forth on Plaintiffs' final account statements was a "direct" result of the fraud. In *St. Paul Fire & Marine Ins. Co. v. Branch Bank & Trust Co.*, 834 F.2d 416 (4th Cir. 1987), for example, the insurer "agreed to indemnify [insured bank] for any 'loss resulting *directly* from dishonest or fraudulent acts of an Employee.'" *Id.* at 417 (emphasis added). The Fourth Circuit affirmed the District Court's holding that the policy covered interest that was received, even though the payment of that interest could "be traced to bank funds obtained through a fraudulent transaction." *St. Paul Fire & Marine Ins. Co. v. Branch Bank & Trust Co.*, 643 F. Supp. 648, 651 (E.D.N.C. 1986).

Other courts under similar facts and policy language have found that the insured was covered for the "face value of fictitious loans." *See First Nat'l Bank of Dillonvale v. Progressive Cas. Ins. Co.,* 640 N.E.2d 1147, 1149-50 (Ohio Ct. App. 1993) ("[w]hen fictitious loans are created and used to pay old interest on pre-existing loans, the face value of the fictitious loans, plus interest accrued on them, is the amount of loss to the bank), *abrogated on other grounds by Bush v. Cardinal Co.*, 2003 WL 22332938 (Ohio Ct. App. 2003); *Puget Sound Nat'l Bank v. St. Paul Fire & Marine Ins. Co.,* 645 P.2d 1122, 1130 (Wash. Ct. App. 1982) (finding it possible for the parties to have expected loss of interest payments not yet received to be covered under "the ambiguous term 'loss sustained'"). *See also Union Planters Bank, N.A. v. Cont'l Cas. Co.*, 478 F.3d 759, 764-66 (6th Cir. 2007) (losses based on worthless collateral satisfy the "loss resulting

---

[13] *Merriam's* definition of the adjective "direct" includes, for example, "having no compromising or impairing element." *Merriam, supra,* at 353. The *American Heritage College Dictionary* defines "directly" as "[w]ithout anyone or anything intervening." *Id.* at 393. It cannot be the case that the fraud was a disqualifying intervening event, because the coverage was for fraud.

directly from" requirement).

Perhaps the Sixth Circuit put it best, in *Visconsi v. Lehman Bros., Inc.*, 244 Fed. Appx.

708, 713-14 (6th Cir. 2007):

> Plaintiffs gave $21 million to Gruttadauria, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope – indeed a reasonable expectation – that it would grow. Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. Had Gruttadauria invested Plaintiffs' money as requested, their funds would have likely grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which . . . would have placed their money in the stock market during one of the strongest bull markets in recent memory. In fact, the fictitious statements issued by Lehman, which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $ 37.9 million (even accounting for the withdrawal of more than $ 31.3 million). Plaintiffs thus could have reasonably believed that they were entitled to the full $ 37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals. We therefore reject Lehman's argument because it is founded on an improper – and wholly inadequate – measure of damages.

*See also SEC v. Byers*, 637 F. Supp. 2d 166, 182 (S.D.N.Y. 2009) (Chin, J.) (allowing

distribution in Ponzi scheme liquidation to include claims for reinvested "illusory" profits).

As support for their argument, Defendants cite cases that are factually and procedurally

distinguishable. Def. Mot. at 16. These cases are governed by different contracts containing

their own definitions and exclusions that are inapplicable here. Moreover, they were decided

only after discovery. For example, Defendants' primary authority, *Citizens Bank & Trust Co. v.*

*St. Paul Mercury Ins. Co.*, 2007 U.S. Dist. LEXIS 96529 (S.D. Ga. 2007), was decided on

*summary judgment*, after discovery and expert disclosures, and provides no basis for dismissing

Plaintiffs' claims at the pleading stage.[14] Moreover, the Court held that the insured bank could

---

[14] Likewise, in *FDIC v. United Pacific Ins. Co.*, 20 F.3d 1070 (10th Cir. 1994), the Tenth Circuit affirmed the district court's judgment notwithstanding the verdict, which was granted *after trial*. *Fidelity & Deposit Co. of Maryland v. USAForm Hail Pool, Inc.*, 463 F.2d 4, 7 (5th Cir. 1972), involved allegations of "the taking of money from [one] account of an insured company to pay

not recover for "accrued interest on prior fraudulent notes" drafted by a dishonest employee, *id.* at *6-7, because the losses were "theoretical or bookkeeping." *Id.* at *11.  Put differently, *unlike here*, the insured bank in *Citizens Bank* never had the ability to withdraw the money because the money only existed as a matter of accounting.

Defendants also cite to *In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004), to support their argument that "basing customer recoveries on fictitious amounts . . . would allow customers to recover arbitrary amounts that necessarily have no relation to reality."  Def. Mot. at 16-17 (quoting *id.* at 88).  However, *New Times* actually supports *Plaintiffs*, at least to the extent that *New Times* is relevant – *New Times* involved the interpretation of "net equity" under SIPA.

Specifically, the Ponzi scheme at issue in *New Times* involved the "solicit[ation] [of] customers . . . to invest in (i) one or more *non-existent* money market funds . . . , [or] (ii) shares of *bona fide* mutual funds (from, *e.g.*, The Vanguard Group and Putnam Investments), that were never, in fact, purchased. . . ." 371 F.3d at 71-72 (emphasis added).  As to the *latter group* of customers, the Trustee calculated "net equity" based on *customer statements* even though, *like this case,* the securities were never purchased.  As described by the Second Circuit, those "who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably [than the customers whose statements showed bogus mutual funds]." *Id.* at 74.  Here, Plaintiffs are precisely like the second set of *New Times* victims and unlike the first:  "Plaintiffs and the Class received account statements that showed real historical performance by real securities allegedly purchased by Madoff."  SAC ¶ 8.  There were no bogus or non-existent securities on Plaintiffs' statements.  *See also Visconsi*, 244 Fed. Appx. at 713-14

---

other legitimate obligations of that company," facts which are not present here.  In *Everhart v. Drake Mgmt., Inc.*, 627 F.2d 686 (5th Cir. 1980), the bank's claim for coverage was denied primarily because the bank lacked standing, which is not at issue here.

(finding damages where "the fictitious statements . . . were designed to track Plaintiffs' funds as if they had been properly invested").

Again, therefore, under the present circumstances Plaintiffs' loss is plainly "direct," and at a minimum, there exists sufficient ambiguity to deny Defendants' motion at this early stage.

### 3.    Plaintiffs "Parted With Something of Value"

One day, Plaintiffs had an account from which they could withdraw millions of dollars at will. The next day, they didn't. Thus, and for all the reasons previously stated, Plaintiffs plainly parted with something of value.

### 4.    Plaintiffs' Loss Included Non-Recoverable Tax Payments

Defendants falsely argue, in a footnote, that Plaintiffs have not alleged that they made "non-recoverable income tax payments." Def. Mot. at 19 n.24. This is simply wrong. *See* SAC ¶ 35 ("[N]on-recoverable income tax payments based on Madoff [account] statements reflect actual out-of-pocket pecuniary losses resulting directly from the Madoff fraud.").

Defendants also argue in their footnote that to support a claim Plaintiffs would have to (but did not) "make the nonsensical allegation that Madoff perpetrated his fraud 'in order to induce' them to pay taxes." Defs.' Mot. at 19 n.24 (citing Defs.' Ex. A at A-36). This seemingly appealing argument takes the "in order to" language out of its true context, and unfairly suggests that the Endorsement says something that it does not. What the Endorsement *actually* says, is that "[f]raud … means … [a]ny other intentional perversion of truth by someone … perpetrated *in order to* induce you … to part with something of value." Defs.' Ex. A, at A-36 (emphasis added). There is no question that Madoff's fraudulent acts were conducted in order to induce Plaintiffs to part with something of value – presumably that's what a loss is, and it exists here.

Tax consequences, in turn, when foreseeable, are recoverable. *See, e.g., Alexsey v. Kelly*, 205 A.D.2d 650, 651 (2d Dep't 1994) (tax consequences "compensable as damages" where they

"represent[] the natural and foreseeable consequences" of the defendants' breach).[15] Because paying taxes based on the fraud was a necessary and unavoidable result of Madoff's fraud, and was necessary to the concealment and continuation of the fraud, it was reasonably foreseeable to Madoff that when Plaintiffs realized a gain, they would pay taxes. Madoff need not have perpetrated his fraud "in order to" induce Plaintiffs to pay taxes. Rather, it is sufficient that the tax consequence of the Ponzi scheme was a direct result of a "[f]raud ... perpetrated in order to induce ... [Plaintiffs] to part with something of value." Defs.' Ex A, at A-36. *See St. Paul*, 834 F.2d at 418 ("BB & T has lost more than the $ 215,924.96 voluntarily paid by St. Paul, because it was required to pay income tax on the interest payments").

**D.    Read As A Whole Or Otherwise, The Exclusions Do Not Clearly And Unambiguously Support Defendants' Interpretation**

Where insurance contracts contain exclusions, as does the Endorsement at issue here, 'the insurer generally bears the burden of proving that the claim falls within the scope of an exclusion . . . by demonstrating that the 'exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'" *David v. Am. Home Assur. Co.*, 1997 U.S. Dist. LEXIS 4177, at *6-7 (S.D.N.Y. 1997) (citations omitted). *See also Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984) (exclusions "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction"). Furthermore, the insurer must establish that "'its interpretation ... is the only construction that [could] be fairly placed thereon.'" *Parks Real Estate*, 472 F.3d at 42 (citation omitted); *see also Royal Ins. Co. of Am. v. Ru-Val Elec. Corp.*, 1996 U.S. Dist. LEXIS 3094, at *3-4 (E.D.N.Y. 1996) (ambiguities are to be construed "in favor of the insured, particularly those found in

---

[15] Defendants' citation to *Blaney v. International Ass'n*, 87 P.3d 757 (Wash. 2004), Def. Mot. at 19, is inapposite because *Blaney* involved the interpretation of a Washington State statute, not the terms of an insurance contract.

exclusion clauses.").[16]  Defendants have not met their burden here.

The exclusions upon which Defendants rely once again are based on undefined terms. Defendants argue that they do not cover losses that are an "indirect" result of a Fraud SafeGuard event, but as with the term "direct," Defendants do not define the term "indirect."  As previously argued, a reasonable insured would (correctly) understand the losses at issue to be "direct."

A term that *is* defined, is the term "Indirect Loss."  However, and critically, this term is defined as the "inability to realize *income* that *you would have realized* had there been no loss." (emphasis added).  Defs.' Ex. A, at A-40.  Several points.

First, the word "income" is undefined, which once again dooms Defendants' argument.

Second, as used in this exclusion, the term "income" appears to mean the ability to continue to achieve earnings after the loss of the underlying asset.  For example, a bondholder in the tenth year of a twenty year bond paying 6%, who lost his or her bond through fraud, would be able to claim as a loss the principal and interest already accrued on the bond, but could not claim as a loss the 6% interest going forward.

Third, and relatedly, "income" does not remain "income" indefinitely.  At some point – usually at the end of the calendar or fiscal year, or after taxes are paid – income is compounded with, and becomes part of, principal.[17]  Similarly, one does not pay taxes on the same "income"

---

[16] California law is no different.  *See Freedman v. Queen Ins. Co.*, 56 Cal. 2d 454, 457 (1961) ("[E]xceptions and exclusions are construed strictly against the insurer and liberally in favor of the insured.").

[17] "As far as compound interest (earning 'interest on your interest') – suppose you deposit $1000 in a bank account that pays five percent interest annually.  *At the end of one year, your balance will have grown by $50* (that's five percent of your starting thousand) to $1050.  Assuming you leave the entire $1050 in your account, the interest you get during the next year will be greater – five percent of the entire $1050.  So compound interest is nothing mysterious; it's just a fixed rate of 'rent' *on your ever-growing principal.*"  *See* http://www.moneychimp.com/articles/finworks/fmfutval.htm. (emphasis added).

annually. Once taxes are paid on 2008 income they need not be paid again, because the income is no longer income; it has become principal. Similarly, income on an income statement does not remain there indefinitely. It becomes an asset on the balance sheet.

Finally, all of these same arguments also apply to Defendants' contention that Plaintiffs are seeking prohibited coverage for "income that [they] would have realized had there been no loss" or a "guarantee of the financial performance of any financial instrument or investment vehicle." *See* Def. Mot. at 17-18. Plaintiffs do not seek a guarantee of *future* financial performance, which is how any reasonable insured would understand these Endorsement provisions. Plaintiffs are seeking coverage for amounts credited to their accounts long, long ago.

Accordingly, the exclusions do not apply, or, at worst, are ambiguous in this situation.

### E.    Any "Netting" Approach Must Utilize Constant Dollars

Even were it permissible for Defendants to net withdrawals against deposits – it is not – Defendants must compare apples to apples. It is axiomatic that a dollar deposited in 1995 is worth more than a dollar withdrawn in 2005. Thus, Defendants' netting approach must use constant dollars. The SEC has endorsed such an approach in the bankruptcy proceeding.[18] *See* SEC Brief, Defs.' Ex. L, at 1, 9-10 ("[C]alculating claims in constant dollars . . . tak[es] into account the economic reality that a dollar invested in 2008 has a different value than a dollar invested twenty years earlier."); *see also Am. Trust & Sav. Bank v. U.S. Fid. & Guar. Co.*, 418 N.W.2d 853, 856 (Iowa 1988) (insurer required to pay statutory interest on stolen funds).

Such an approach is even more appropriate here, because the Policy expressly provides

---

[18] Under this approach, and applying the consumer price index inflation calculator on the U.S. Department of Labor's website (*see* http://www.bls.gov/data/inflation_calculator.htm (last visited Feb. 23, 2010)) to the figures that Defendants used to calculate net loss, Plaintiffs calculate that under Defendants' approach but using constant dollars, Plaintiffs suffered a net loss of more than $600,000. This is well above the coverage limit of $30,000.

19

"coverage adjustments for inflation." Defs.' Ex. A, at A-11.  Nor can Defendants escape this Policy language by arguing that it is contained in the Policy rather than in the Endorsement; the Endorsement states that, "[w]ith respect to coverage provided by this endorsement, all provisions and conditions of the policy apply unless they are changed by this endorsement." *Id.* at A-36. Because the Endorsement does not change the Policy's provisions regarding inflation, the Policy's provision of "coverage adjustments for inflation" is applicable here.  *See County of Columbia v. Cont'l Ins. Co.*, 83 N.Y.2d 618, 628 (1994) ("[I]n construing an endorsement to an insurance policy, the endorsement and the policy must be read together, and the words of the policy remain in full force and effect except as altered by the words of the endorsement."); *Penna v. Fed. Ins. Co.*, 28 A.D.3d 731, 731-32 (2d Dep't 2006) (same).

### F.    In Addition, Any "Netting" Analysis Cannot Begin On Day One

#### 1.    "Netting" Cannot Precede Endorsement Inception

Defendants concede that Plaintiffs' Endorsement has been "effective only since October 1st, 2008," and that the Endorsement was not even legally approved until August 30, 2007.  Def. Mot. at 7, 21 and 22, n.28.  Therefore, at a minimum, Defendants agreed to insure Plaintiffs' account balance as it existed on October 1, 2008.  Yet without explanation, Defendants begin their "netting" analysis as of 1997, *see* Defs.' Ex. H, years before Plaintiffs purchased the Endorsement.  Defendants cannot dispute that they agreed to insure Plaintiffs' assets as of the date the Endorsement was purchased.  Thus, at a minimum, and for all policyholders, Defendants can only net withdrawals against deposits as of the date the Endorsement was purchased.  At the very least, there exists an ambiguity on this issue.

#### 2.    "Netting" Also Cannot Precede The Unknown Start Date (and Other Details of the Scheme) With Respect To Each Account

Defendants cannot identify the date the Madoff Ponzi scheme started, yet they denied

Plaintiffs' claim on that basis because they assume that all gains were illegitimate.  As "proof" that *all* customer accounts were enmeshed in the Ponzi scheme from day one (an issue Defendants never really address), *and* that the Ponzi scheme began before Plaintiffs began depositing, Defendants cite to the statements of two convicted felons.  Def. Mot. at 20-22.  In addition, Defendants point to sources that contend these felons are lying, and that opine that the government, at least, *believes* that the Ponzi scheme began even earlier.  *Id.*  The truth, however, is that no one really knows when the scheme started, or whether it even started all at once.[19]

Moreover, the Trustee has not provided any information regarding the known transfers of funds between BMIS's legitimate market-making and proprietary trading businesses, and the fraudulent investment advisory business.  It is entirely possible that a portion of Plaintiffs' gains were legitimate investment returns stemming from these transfers.  *See* Declaration of Joseph Looby, Friedman Decl., Ex. E, at ¶ 27 ("Review of the financial history of BLMIS demonstrates that neither [the market-making or propriety trading units] would have been viable without the fraudulent [investment advisory business], the proceeds of which were used to sustain those business operations from at least 2007 forward.").

In either event, to the extent certain of Plaintiffs' gains were legitimate, such gains were legitimately *their* money.  Such gains serve to increase Plaintiffs' principal, and the withdrawals of such gains cannot be netted out against Plaintiffs' withdrawals.  At a minimum, Plaintiffs and the Class are entitled to their own opportunity to litigate these factual issues, and are not bound by the untested statements of convicted felons or the untested speculation of government officials.  *See Jackson v. Ramundo*, 1997 U.S. Dist. LEXIS 17035, at *11-12 (S.D.N.Y. 1997) (collateral estoppel requires a full and fair opportunity to litigate).

---

[19] Interestingly, the "proof" to which Defendants cite all post-dates their denial of Plaintiffs' claim on February 18, 2009.

### G.     Plaintiffs Have An Insurable Interest

Defendants' "insurable interest" argument is simply a summary of their other arguments in different clothing.  Contrary to Defendants' tired arguments, Plaintiffs have an insurable interest because they ordered their lives around their ability to withdraw money based on their account statements, in fact did so, and paid taxes based on those statements.  Thus, they derived a "pecuniary benefit or advantage from [their BMIS account's] preservation." *Scarola v. Ins. Co. of N. Am.*, 31 N.Y.2d 411, 413 (1972).  *See Cal. Food Serv. Corp., Inc. v. Great Am. Ins. Co.,* 130 Cal. App. 3d 892, 897 (1982) (there is an insurable interest "when 'the insured has a direct pecuniary interest in the preservation of the property and … will suffer a pecuniary loss as an immediate and proximate result of this destruction'") (citation omitted).

Moreover, courts have held that where property is not rightfully the insured's, even where the property is stolen, the insured, as an innocent purchaser of the stolen property, may still have an insurable interest in that property.  *See Scarola*, 31 N.Y.2d at 413 (finding that an innocent purchaser had an insurable interest in a stolen car where he "had a right to possession of the car against any contrary assertion except that of the true owner"); *Riley v. Mid-Century Ins. Exch.*, 118 Cal. App. 3d 195, 200 (1981) (same).  Here, until December 2008, Plaintiffs were totally unaware that Madoff was perpetrating a Ponzi scheme.

## III.    PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Defendants argue that Plaintiffs have not stated a claim for breach of the implied covenant of good faith and fair dealing because there is no predicate breach of contract.  But for the reasons discussed above, there *is* a predicate breach of contract in this case.

Moreover, even if there was not a breach of contract – and there is – Plaintiffs' claim may stand on its own.  *See Gross v. Empire Healthchoice Assurance, Inc.*, 2007 N.Y. Misc.

22

LEXIS 4962, at *4 (Sup. Ct. N.Y. County 2007 ) ("New York courts have repeatedly affirmed that a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain.") (citations omitted); *see Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 41 A.D.3d 269, 270 (1st Dep't 2007).[20]

## IV.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED AN UNJUST ENRICHMENT CLAIM

Defendants argue that no unjust enrichment claim can exist where the parties have a valid contract. But "where a litigant fails to establish the right to recover upon an express contract he may, in the same action, recover in *quantum meruit*." *Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*, 187 A.D.2d 225, 228 (1st Dep't 1993). *See Am. Tel. & Util. Consultants, Inc. v. Beth Isr. Med. Ctr.*, 307 A.D.2d 834, 835 (1st Dep't 2003) (same). "[W]here there is a bona fide dispute as to the existence of a contract *or where the contract does not cover the dispute in issue*, plaintiff may proceed upon a theory of *quantum meruit* and will not be required to elect his or her remedies." 307 A.D.2d at 835 (emphasis added).[21]

---

[20] Again, California law is the same. *State Farm Mut. Auto. Ins. Co. v. Super. Ct.*, 123 Cal. App. 4th 1424, 1433 (2004) (where "an insurer 'fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing.'") (citation omitted).

[21] According to the California Supreme Court, California law is the same. *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 50-52 (1996) (plaintiff "entitled to seek relief under traditional equitable principles of unjust enrichment," particularly where his claim seeks restitution and where other remedies are inadequate). Unlike *Ghirardo*, none of the three cases that the Defendants cite are from California's highest court.

## V.   PLAINTIFFS' FOURTH AND SIXTH CAUSES OF ACTION FOR DECLARATORY RELIEF ARE PROPERLY PLED

Defendants argue that Plaintiffs' fourth cause of action for declaratory relief regarding the proper calculation of "loss" should be dismissed because it "raises precisely the same issue as" Plaintiffs' breach of contract claim.  Defs.' Mot. at 23-24.  However, under Fed. R. Civ. P. 57, "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  *See Dream Spa, Inc. v. Fireman's Fund Ins.*, 2008 U.S. Dist. LEXIS 8933, at *7 (S.D.N.Y. 2008) (insured brought breach of contract claim and declaratory judgment claim); *J.J.J. Props., Inc.  v. Travelers Indem. Co.*, 2008 U.S. Dist. LEXIS 51992, at *1 (S.D.N.Y. 2008) (insured brought action for money damages and declaratory judgment).  *See also Lang v. Hanover Ins. Co.*, 787 N.Y.S.2d 211, 213 (N.Y. 2004) ("There is no dispute that parties to an insurance contract – the issuer, a named insured or a person claiming to be an insured under the policy – may bring a declaratory judgment action against each other when an actual controversy develops concerning the extent of coverage, the duty to defend, or other issues arising from the insurance contract.").

Here, declaratory relief is appropriate because it will force Defendants to apply the Endorsement as defined in this action to *all* policyholders who have it, and will prevent Defendants from seeking to moot a litigated result that otherwise would be applicable through principles of collateral estoppel to *all* Madoff customers who own the Endorsement, by simply "paying off" (through an offer of judgment) the named Plaintiffs.  Indeed, as set forth in the Friedman Declaration, Defendants already have suggested precisely this tactic.  Thus, it is clear why Defendants want this claim dismissed:  once dismissed, they may attempt to pay Plaintiffs their $30,000, and wait to see whether any other lawyers are willing to initiate litigation over a $30,000 claim.  *See Broadview Chem. Corp. v. Loctite Corp.*, 474 F.2d 1391, 1393 (2d Cir.

24

1973) ("[T]he principal purpose of a declaratory judgment is to clarify and settle disputed legal relationships and to relieve uncertainty, insecurity and controversy.").

In their sixth cause of action, Plaintiffs seek a declaration that all applicable statutes of limitation and repose are tolled, and that all doctrines of laches do not apply, as of the date Defendants' method of determining Madoff customers' losses first became a matter of public record.  SAC ¶ 83.  Defendants argue this cause of action is premature and redundant of issues that will be raised in any answer they may file.  But again, any time-related affirmative defenses (there can and likely will be *none*) will relate only to *Plaintiffs'* case, which was timely filed under any conceivable theory.  Tellingly, Defendants have not sought dismissal for untimeliness.

A declaration is necessary, therefore, to provide complete relief to the Class.  *See Iron Mountain Sec. Storage Corp. v. Am. Specialty Foods, Inc.*, 457 F. Supp. 1158, 1162 (E.D. Pa. 1978) (refusing to dismiss counterclaim where a ruling on plaintiffs' claim would not necessarily provide defendants all relief that may be obtained by counterclaim).  Moreover, Defendants make no showing that there would be "a complete identity of factual and legal issues between the complaint" and any answer they may file.  *See Univ., Patents, Inc. v. Kligman*, 1991 U.S. Dist. LEXIS 11917, at *3-4 (E.D. Pa. 1991).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.[22]

---

[22] This is Plaintiffs' first complaint tested by a motion to dismiss.  Should the Court grant Defendants' motion, particularly on the grounds of a correctable pleading error, Plaintiffs respectfully request that they be permitted to amend their complaint.  *See Fuji Photo Film U.S.A., Inc. v. McNulty*, 2009 U.S. Dist. LEXIS 104774, at *15 (S.D.N.Y. Nov. 4, 2009) (leave to amend should be freely granted absent factors not present here).

Dated:  February 23, 2010

**MILBERG LLP**


<u>s/ Brad N. Friedman</u>
Jennifer L. Young
Joshua E. Keller
One Pennsylvania Plaza, 49th Floor
New York, NY  10119-0165
Telephone:  (212) 594 -5300
Facsimile:   (212) 868-1229
E-mail:      bfriedman@milberg.com
             jyoung@milberg.com
             jkeller@milberg.com

*Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Brad N. Friedman, certify that on the 23rd day of February 2010, I caused a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE CHARTIS DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT to be filed and served on the parties to this action via electronic filing. In addition, service was effectuated via overnight mail to the following addresses:

> Charles J. Rocco
> Malcolm James Reilly
> Clausen Miller, P.C.
> One Chase Manhattan Plaza
> New York, NY 10005
>
> Michael Barry Carlinsky
> Jane M. Byrne
> Quinn Emanuel Urquhart Oliver & Hedges LLP
> 51 Madison Avenue, 22nd Floor
> New York , NY 10010

<u>s/ Brad N. Friedman</u>
