UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ROBERT and HARLENE HOROWITZ, On
Behalf of Themselves and All Others Similarly
Situated,

                    Plaintiff,

      - against -

AMERICAN INTERNATIONAL GROUP,
INC., et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 30, 2010

09 Civ. 7312 (PAC)

MEMORANDUM
OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendants American International Group, Inc. ("AIG") and other affiliated companies[1] (together "AIG") move to dismiss the Plaintiffs' claims and to strike their class action allegations. Plaintiffs Robert and Harlene Horowitz ("Horowitzs"), who also sue on behalf of other claimed to be similarly situated, purchased AIG's homeowners' insurance policy with coverage for Fraud SafeGuard Events ("Policy"). The Policy provides coverage for "the loss of money [or] securities…up to the applicable Limits of Insurance shown in the schedule, resulting directly from fraud, embezzlement, or forgery perpetrated against [the policyholders] or [the policyholders'] family member[s] during the Policy Period."

The Horowitzs and other policy owners invested funds with Bernard L. Madoff Investment Securities ("Madoff" or "BMIS"), anticipating that he would invest their

---

[1] The other companies affiliated with AIG, named as Defendants in this lawsuit, are American International Insurance Company of California ("AIICC"), Chartis Inc. ("Chartis"), AIU Holdings, Inc. (now known as Chartis Inc.), AIG Private Client Group, AIU Holdings LLC (also known as Chartis International, LLC), AIG Property Casualty Group Inc. (now known as Chartis Inc.), and John Does 1-49, also AIG subsidiary companies.

money in the "greatest bull market in history." (Second Amended Complaint ("2d Am. Compl.") ¶ 8.) As we now know, Madoff was a consummate fraudster whose Ponzi scheme makes all similar prior schemes seem like small beer. The Horowitzs were more fortunate than most, however, as they made withdrawals from BMIS that exceeded their original investment by over $225,000. Nonetheless, they filed a claim with the AIG Defendants, on the basis that they made their investment with the reasonable expectation that it would yield earnings, not just a return on capital. They filed a claim based on the balances shown in their last account statement—over $8.5 million—which would result in the payment of the full fraud policy limits of $30,000. Defendants rejected the claim because the Plaintiffs had experienced no loss in that they had withdrawn a greater sum than they had deposited.

Upon Defendants' rejection of their claim, Plaintiffs initiated the present action. Plaintiffs' second amended version of its complaint asserts six claims: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) unjust enrichment, (4) declaratory relief as to Plaintiffs' loss; (5) declaratory relief as to the fact and consequences of Defendants' inability to determine the date when Madoff's Ponzi scheme began; and (6) declaratory relief as to statutes of limitation and repose, doctrines of laches, and similar statutes. In a word, Plaintiffs seek payment of the insurance policy up to its limits and an obliteration of all impediments to recovery.

The terms of the Policy, however, are clear and unambiguous. The Policy was not breached as Plaintiffs did not experience a loss within the meaning of the Policy contract language. Since there is no liability on the contract, Plaintiffs' additional claims must be dismissed as well. Plaintiffs' arguments to the contrary are rejected. Finally,

since there is no bona fide claim on the merits, the motion to strike the class action allegations is moot.

## I. Facts[2]

Effective October 1, 2008, Plaintiff Robert Horowitz owned a homeowner's insurance policy with protection for Fraud SafeGuard through Defendants AIG Private Client Groups, now a division of Chartis Inc., and American International Insurance Company of California. Inc. ("AIICC"). (Carlinsky Decl. Ex. A, at A-1.) Plaintiff Harlene Horowitz was a co-insured under the Policy. Mr. Horowitz was a customer of BMIS since approximately 1997 and a customer of BMIS through a Revocable Trust called the Horowitz Family Trust ("Trust") since approximately August 2003. Mr. and Mrs. Horowitz both are trustees, trustors, and beneficiaries of the Trust and pursuant to its terms were entitled to remove all of its funds at will. (2d Am. Compl. ¶ 3.)

Defendant AIG is the parent company to various entities, including all of the other named Defendants. (Id. ¶ 13.) Defendant AIICC is a wholly owned subsidiary of AIG and an insurance company that writes personal lines of insurance through AIG's Personal Lines Pool, made up primarily of private passenger auto, homeowners', and other personal lines products. Substantially identical Policies were issued by AIICC and/or other AIG subsidiary companies to all other Class members.[3] (Id. ¶ 14.)

---

[2] In ruling on a motion to dismiss, courts accept the facts alleged in the complaint as true and "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Courts also consider "matters of which judicial notice may be taken." Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999).

[3] Defendant AIG Private Client Group is a division and/or subsidiary of the personal lines property and casualty insurance subsidiaries of AIG; it sent letters on behalf of AIICC to Plaintiffs and class members denying their claims for losses resulting from the Madoff scheme. (2d Am. Compl. ¶ 15.) Defendant AIU Holdings, Inc. (now known as Chartis Inc.) is a wholly owned subsidiary of AIG; AIG Private Client Group was a division of AIU Holdings, Inc. until approximately July 28, 2009. (Id. ¶ 16.) Defendant AIU

AIG Fraud SafeGuard coverage insures against "loss[es] of money[4] [or] securities"[5] resulting "directly from fraud, embezzlement, or forgery."  The Policy defines fraud to include "[a]ny…intentional perversion of truth by someone other than you or a family member perpetrated in order to induce you or a family member to part with something of value."  The sales brochure for the fraud coverage further states that it will "secure your important assets—money, securities, personal property, jewelry and collectibles[—against] today's sophisticated criminals and new risks."  (Id. ¶ 25.)  The Policy lists several exclusions, including "any loss that is an indirect result of any fraud guard event including but not limited to: (a) [the policyholder's] inability to realize income that [he or she] would have realized had there been no loss or damage to money, securities, or other property."  (Carlinsky Decl. Ex. A, at A-40.)  While the Plaintiffs assert that they paid more than $11,400 in premiums for coverage of up to $30,000 per event, these payments were for the entire homeowner's policy.  (Id. ¶ 7.)  The cost for the Fraud SafeGuard endorsement was only $115. (Mem. in Supp. Mot. to Dismiss at 6 n.10.)

---

Holdings LLC (also known as Chartis International, LLC) is a wholly owned subsidiary of AIG; AIG Private Client Group was a division of and/or controlled by AIU Holdings LLC during the relevant period.  (Id. ¶ 17.)  Defendant AIG Property Casualty Group, Inc. (now known as Chartis Inc.) is a wholly owned subsidiary of AIG; AIG Private Client Group was a division of and/or controlled by AIG Property Casualty Group, Inc. during the relevant period.  (Id. ¶ 18.)  On July 27, 2009, Defendant Chartis Inc. announced that AIG's General Insurance would be rebranded and do business as Chartis Inc.; AIG Private Client Group is a division of and is controlled by Chartis Inc.  (Id. ¶ 19.)  Although Plaintiffs do not know the names or capacities of the defendants named as John Does 1-49, they believe these companies issued Policies in each state that are substantially identical to the Policies issued in California by AIICC and/or other AIG subsidiary companies to the Plaintiffs.  (Id. ¶ 20.)  Plaintiffs further allege that the actions taken by one Defendant are indistinguishable from those taken by the others because all acted together in drafting the Policies providing Fraud SafeGuard coverage and in denying coverage for the presently disputed claims.  (Id. ¶ 21.)
[4] The Policy defines "money," in relevant part, as "[c]urrency, coins and bank notes in current use and having a face value."  (Carlinsky Decl. Ex. A at A-36.)
[5] The Policy defines "securities" as "negotiable and non-negotiable instruments or contracts representing either money or property."  (Id. at A-37.)

In December 2008, Madoff revealed that his investment advisory business, BMIS, was a fraud and "all just one big lie," "basically, a giant Ponzi scheme." (Carlinsky Decl. Ex. D, at 4) For years, Madoff had been "paying returns to certain investors out of the principal received from other, different, investors." (Id.) In other words, he "paid investors with money that wasn't there." (Id.) Madoff estimated approximately $50 billion of losses from this fraud. According to the Second Amended Complaint, Madoff has since denied that it was always a Ponzi scheme. (2d Am. Compl. ¶ 27.) Plaintiffs now emphasize that the date the Ponzi scheme began is unknown and still in dispute. (Id. ¶ 5) Their original complaint and Madoff's testimony indicate that the Ponzi scheme began in the early 1990s, but Judge Denny Chin commented during the sentencing hearing that the fraud (though perhaps not the commingling) may have begun even earlier. (Complaint ¶ 3; Carlinsky Decl. Ex. E, at 25; Carlinsky Decl. Ex. N, at 43.) On December 11, 2008, Madoff was arrested and charged with securities fraud. (2d Am. Compl. ¶ 28.) On March 12, 2009, he pleaded guilty to 11 criminal counts (Id. ¶ 29) and, on June 29, 2009, was sentenced to 150 years in prison. (Carlinsky Decl. Ex. N, at 49.)

Plaintiffs deposited $4,327,230.55 into their BMIS account and withdrew $4,553,000.00 for a net gain of $225,769.45. (Carlinsky Decl. Ex. H, at H-8.) The final balance reflected in the last BMIS statement received by the Plaintiffs, dated November 30, 2008, was over $8.5 million. Plaintiffs filed a claim with AIICC for the full amount of their final balance. (2d Am. Compl. ¶¶ 30, 31.)

By letter dated February 18, 2009, Defendants, through an AIG Private Client Group Claims Analyst writing on behalf of AIICC, denied coverage on the ground that their accountants determined that certain "investment account(s) exceed the amount

of…capital contributions.  Any alleged gains, growth, or appreciation of…capital contributions are the subject of the Madoff Fraud scheme [and] are not covered by the Policy.  Accordingly, [there is] no covered loss."  (Id. ¶ 32.)  Then, by letter dated May 6, 2009, Defendants, through an AIG Private Client Group Claims Analyst writing on behalf of AIICC, applied exclusions for

> loss arising out of a business or professional service engaged in by the insured or a family member; any guarantee of the financial performance of any financial instrument or investment vehicle; **indirect loss resulting from any fraud guard event, including, but not limited to, an inability to realize income that would have realized had there been no loss or damage to money [or] securities**…; and investment loss due to corporate fraud (loss due to the change in value of securities issued by a business where the loss results from fraud by the business which issued the securities).

(Id. ¶ 41.)  Plaintiffs assert that Defendants also pointed to an exclusion for losses "caused by the confiscation, destruction, or seizure of property by any governmental or public entity or their authorized representative."  (Id. ¶ 39.)

In an August 21, 2009 article from the New York Post, AIG spokeswoman Christine Pretto stated that "we declined the [P]laintiffs' claim because they received more money from Madoff through withdrawals in their account than they had deposited."  (2d Am. Compl. ¶ 42.)  In the same article, Ms. Pretto also stated that the company "has paid out hundreds of eligible policyholders who suffered Madoff-related losses pursuant to this coverage."  (Id.)

**II. Procedural History**

Plaintiffs Robert and Harlene Horowitz commenced this action on August 19, 2009 on behalf of a proposed class of all AIG policyholders in the United States who lost money due to Madoff's Ponzi scheme during the time they held an AIG homeowner's

insurance policy with AIG Fraud SafeGuard coverage. (Complaint ¶ 35.) On September 22, 2009, Plaintiffs filed a First Amended Complaint, and on January 7, 2010, they filed a Second Amended Complaint. The class is now defined as

> all policyholders who had an account with [BMIS] on December 10, 2008, or any feeder fund, fund of funds, or other fund that had an account with BMIS on December 10, 2008, and who were insured under a homeowner's insurance policy with coverage for Fraud SafeGuard Events…underwritten or sold by any of the Defendants or any of their affiliated companies where the defined Policy Period encompassed the Madoff fraud.

(2d Am. Compl. ¶ 3.) Plaintiffs have raised six claims in the Second Amended Complaint. See supra at 2.

Defendants filed their motion to dismiss the Second Amended Complaint and motion to strike the class allegations on January 22, 2010.

**III. Analysis**

**A. Motion to Dismiss**

Under Rule 12(b)(6), the Court must assume that all facts alleged in the complaint are true and draw all reasonable inferences in favor of the plaintiff. Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007). Asserting legal conclusions is not sufficient. While they provide a framework, they must be supported by factual allegations. Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949-50 (2009). To avoid dismissal, the complaint must contain "enough facts to state a claim to relief that is plausible on its face," that is to say, facts that "nudge[] [the plaintiff's] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Plausibility, in turn, requires only that the allegations in the complaint "raise a

7

reasonable expectation that discovery will reveal evidence" in support of the claim. Id. at 556.

1. **Breach of Contract**

    a. **Contract Interpretation**

When determining whether a insurance policy provides coverage, the interpretation of the contract is a question of law. See, e.g., Waller v. Truck Ins. Exch., Inc., 900 P.2d 619, 11 Cal. 4th 1, 18 (1995); AIU Ins. Co. v. Superior Court, 799 P.2d 1253, 51 Cal. 3d 807, 818 (1990); Vigilant Ins. Co. v. Bear Stearns Comps., Inc., 884 N.E.2d 1044, 1047 (N.Y. 2008).[6] The Court must consider the plain meaning of a clear and unambiguous insurance policy. See, e.g., Waller, 11 Cal. 4th at 18; Morales v. Allcity Ins. Co., 713 N.Y.S.2d 227, 228 (N.Y. App. Div. 2d Dep't 2000); see also Dalton v. Harleysville Worcester Mut. Ins. Co., 557 F.3d 88, 90 (2d Cir. 2009) (interpreting New York law). A provision is ambiguous "when it is capable of two or more constructions, both of which are reasonable," see, e.g., Waller, 11 Cal. 4th at 18; Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 855 P.2d 1263, 5 Cal. 4th 854, 867 (1993); In re Progressive Ins. Cos., 834 N.Y.S.2d 394, 396 (N.Y. App. Div. 3d Dep't 2007); 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co., 815 N.Y.S.2d 507, 511 (N.Y. App. Div. 1st Dep't 2006), but the Court should not "strain to create an ambiguity where none exists." See, e.g., Waller, 11 Cal. 4th at 18-19; Reserve Ins. Co. v. Pisciotta, 640 P.2d 764, 30 Cal. 3d 800, 807 (1982); Maurice Goldman & Sons, Inc. v. Hanover Ins. Co., 607 N.E.2d 792, 793 (N.Y. 1992); Morales, 713 N.Y.S.2d at 228. Nor is ambiguity an abstraction

---

[6] The parties cite to both New York and California law. California is the Plaintiffs' home state and the location of the insured home, the Policy's broker, and the company from which the Policy was purchased. (Mem. in Supp. Mot. to Dismiss at 12 n.18.) The parties agree that the law of the two states does not differ meaningfully in the relevant areas.

since language is to be given meaning in the context of the instrument as a whole and the circumstances of the case. Bay Cities, 5 Cal. 4th at 18; Bank of the W. v. Superior Court, 833 P.2d 545, 2 Cal. 4th 1254, 1265 (1992); Cnty. of Columbia v. Continental Ins. Co., 634 N.E.2d 946, 950 (N.Y. 1994); Richner Commc'ns, Inc. v. Tower Ins. Co. of N.Y., 898 N.Y.S.2d 615, 617 (N.Y. App. Div. 2d Dep't 2010). In deciding whether the contract is ambiguous, the Court should focus on "the reasonable expectations of the average insured upon reading the policy…employing common speech." Mostow v. State Farm Ins. Cos., 668 N.E.2d 392, 394 (N.Y. 1996); see also Gen. Star Indem. Co. v. Custom Editions Upholstery Corp., 940 F. Supp. 645, 654 (S.D.N.Y. 1996); Pisciotta, 30 Cal. 3d at 807.

Plaintiffs argue that this matter cannot be resolved on the pleadings because the contract language is ambiguous. (Mem. in Opp. to Mot. to Dismiss at 7-8.) They point to several terms, such as "loss,"[7] "directly," and "income," which are "wholly undefined." (Id. at 1, 7.) They further argue that established rules of contract construction favor the insured and disfavor the drafter of such form insurance contracts. (Mem. in Opp. to Mot. to Dismiss at 2.) To highlight this perceived ambiguity, Plaintiffs propose four possible measures of recovery under the Policy:

> 1) the full account balance reflected in their final BMIS statement;
> 2) earnings reasonably expected based on a growth assumption or an implied interest rate;
> 3) net loss in constant dollars;
> 4) non-recoverable tax payments;
> 5) legitimate growth on investments during the pre-Ponzi period.

---

[7] The Plaintiffs argue that the contract states that "any loss" and "all loss" will be covered, but these references are made only in the context of defining the coverage limits, as in "[t]he most we will pay for any loss is the applicable Limit of Insurance." (Mem. in Opp. to Mot. to Dismiss at 6.) It is not reasonable to infer that this language somehow modifies the express statement that the Policy only covers loss resulting directly from fraud. (Carlinsky Decl., Ex. A, at A-37.)

9

(Mem. in Opp. to Mot. to Dismiss at i-ii.)  All of these measures of recovery are fictional and none is convincing.

Defendants argue that the insurance policy is unambiguous and should be interpreted based on its plain language.  They move to dismiss Plaintiffs' breach of contract claim on the grounds that they have failed to allege facts that give rise to a loss covered by the Policy.  They make five specific arguments:

1) Plaintiffs cannot allege a loss of money, securities, or property that is the direct result of the Madoff fraud;
2) Plaintiffs' claim falls within the express language of the Policy exclusions;
3) Plaintiffs fail to allege that they "parted with something of value";
4) Plaintiffs do not have an insurable interest required to bring a claim;
5) Plaintiffs fail to allege that they invested during the alleged "pre-Ponzi" period or that some of the fictitious profits were attributable to securities purchased during the policy period.

(Mem. in Supp. Mot. to Dismiss at i.)

This contract is not ambiguous on its face.  See Diversified Grp., Inc. v. Van Tassel, 806 F.2d 1275, 1278 (5th Cir. 1987) (finding a similarly phrased contract to be unambiguous regarding the direct loss provision); Patrick Schaumburg Autos., Inc. v. Hanover Ins. Co., 452 F. Supp. 2d 857, 871 (N.D. Ill. 2006) (finding that the term "indirect loss," similarly defined, is not ambiguous).  The words "loss," "direct," and "income" have common meanings and must be defined in the Policy only if their use deviates from such meanings.  See, e.g., IBM Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 147 (2d Cir. 2004) (citing California and New York cases in holding that "the '"clear and explicit" meaning of [insurance policy] provisions, interpreted in their "ordinary and popular sense" controls judicial interpretation unless "used by the parties in a technical sense or a special meaning is given to them by usage"'").

10

The New York State cases cited by Plaintiff for the proposition that the failure to define the term "loss" creates an ambiguity in the insurance contract are inapposite. The Appellate Division case is brief—just one paragraph—and focused on whether an insured piece of art was lost or simply missing; it did not deal with calculating monetary loss. Foy v. D.B. Frame Shop, Ltd., 620 N.Y.S.2d 356, 356 (N.Y. App. Div. 1st Dep't 1994). OTC Int'l, Ltd. v. All Those Underwriters At Lloyd's Of London Subscribing To Policy Of Insurance Numbered HN99ABXC255, 781 N.Y.S.2d 626 (N.Y. Sup. Ct. 2d Dep't 2004) considered the question of whether a series of thefts counts as a single loss or multiple losses. This ambiguity is foreseeable enough to incorporate the general distinction into the Policy terms. But the possibility of a Ponzi scheme is not predictable.

Furthermore, for Plaintiffs to prevail on the theory that this contract is ambiguous, they must also show that their interpretation of loss is reasonable. As discussed below, however, it is not reasonable to contend that one can lose money that never existed in the first place; and the other asserted measures, though losses, cannot reasonably be considered to result directly from the fraud.

### b. Direct loss of money or securities

The Policy only provides for coverage of a "loss of money, securities or other property…resulting directly from fraud." Black's Law Dictionary defines "direct loss" as "[a] loss that results immediately and proximately from an event." See Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 152 (2d Cir. 1991) (holding that, under the Foreign Sovereign Immunities Act, there is direct loss when plaintiff is deprived of "capital to which it is lawfully entitled" as an immediate consequence of a contractual breach); see also Jefferson Bank v. Progressive Cas. Ins. Co., 965 F.2d 1274, 1281 n.11 (3d Cir. 1992)

11

("There is undoubtedly a difference between 'proximate cause' and 'immediate cause,' despite the similarity in name.  Proximate cause refers to the legal significance of an event in causing harm, whereas immediate cause refers to the closeness in time or space of the cause to the harm."); Diversified Group, Inc., 805 F.2d at 1278 (holding that a similarly worded insurance policy's "potential income" exclusion precluded recovery for "the loss of future profits, or future income flow, resulting from the fraudulent or dishonest conduct"); see generally "Loss? What Loss?": Unique Claims on Crime Policies/Fidelity Bonds, 14 Fidelity L.J. 271 (2008).

　　The present case boils down to one simple concept:  The Policy defines fraud as an untruth perpetrated in order to induce the victim to part with something of value.  That "something of value" is the direct loss resulting from the fraud.  Any other loss is by definition indirect and not covered by the policy.  Because the "something of value" with which Madoff intended the Plaintiffs to part was their principal investment, and because the Plaintiffs recovered that principal plus an additional amount, they suffered no direct loss.  To the extent that they ultimately did suffer some loss on account of this fraud, that loss was indirect.  To the extent that they failed to recover the remaining balance of the account, that "loss," though direct, was not truly a loss but rather was as illusory as the initial, fraudulent gain.

### i.  Full account balance reflected in their final BMIS statement

Plaintiffs allege that their final account balance of over $8.5 million, reflected in the last BMIS statement received, constitutes "money [or] securities" under the Policy, taken by one of "today's sophisticated criminals."  (2d Am. Compl. ¶ 30.)  They argue that, because the full account balance was available for withdrawal upon request, up until

12

the day before the scheme was announced, this money was lost.  (Mem. in Opp. to Mot. to Dismiss at 1.)  Plaintiffs further assert that they "innocently and reasonably relied" on this balance, treating it as their own, and paying taxes on the reported gains.  (Id. at 9-10.) They explain that they did not rely on phony account statements but rather on "statements that showed real historical performance by real securities allegedly purchased by Madoff."  (2d Am. Compl. ¶ 8.)

Defendants argue that, because Plaintiffs withdrew more money than they deposited, they cannot show that they have suffered a "loss" under the Policy.  They state that it "is neither reasonably possible nor logical to construe 'loss' as encompassing wholly fictitious profits and non-existent paper profits or gains in an amount completely fabricated by the wrong-doer."  Finally, Defendants argue that common law bars recovery of the fruits of a fraud.  (Mem. in Supp. Mot. to Dismiss at 13.)

The Defendants are correct that Plaintiffs' first measure of recovery—the final account balance—is not a loss of money or securities, as required by the plain language of the Policy.  The question presented is whether Plaintiffs can lose something that they never actually owned but may have thought they owned.[8]  Most courts that have considered the issue held that the loss of fictitious, theoretical, or book-keeping profits is not direct loss.  See Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co., No. CV305-167, 2007 WL 4973847, at *5 (S.D. Ga. Sept. 14, 2007) (holding that the loss of "income [the bank] would have earned on the funds had the loans been legitimate" is exactly the type of indirect loss excluded from coverage); see, e.g., FDIC v. United Pac. Ins. Co., 20 F.3d 1070, 1080 (10th Cir. 1994); Everhart v. Drake Mgmt., Inc., 627 F.2d 686, 691 (5th

---

[8] For purposes of considering this motion, the Court assumes that it was reasonable for the Plaintiffs to believe that these account statements were valid.

13

Cir. 1980); Fid. & Deposit Co. of Md. v. Usaform Hail Pool, Inc., 463 F.2d 4, 6-7 (5th Cir. 1972). These cases support the proposition that a fraudulent loss following a fraudulent gain does not count as an actual loss, because the victim remains in the same position in which he or she was before any fraud occurred.

This reasoning is correct. The money reflected in the final account statement was not taken from the Plaintiffs by fraud; rather, it never belonged to them, or even existed, in the first place due to fraud. Therefore, they did not lose this money; they lost the mistaken belief that they owned this money. Judge Lifland demonstrated this point in the Madoff bankruptcy liquidation. He declined to calculate net equity under the Securities Investor Protection Act based on the amounts reflected on customers' account statements, noting that "[i]t would be simply absurd to credit the fraud and legitimize the phantom world created by Madoff." In re Bernard L. Madoff Inv. Sec. LLC, SIPA Liquidation No. 08-01789 (BRL), at 30 (S.D.N.Y. Mar. 1, 2010); see also In re New Times Sec. Servs., Inc., 371 F.3d 68, 88 (2d Cir. 2004) (calculating net equity under SIPA without including "artificial interest or dividend reinvestments reflected in the fictitious account statements").[9]

Plaintiff's argument that they suffered a loss because they could have withdrawn the full account balance at any point before the fraud was exposed is speculative and short-sighted. Although part of the Ponzi scheme involved making disbursements, because the fraud was built on a house of cards, there was not enough money for all

---

[9] Plaintiffs further argue that "at a minimum, and for all policyholders, Defendants can only net withdrawals against deposits as of the date the Endorsement was purchased." (Mem. in Opp. of Mot. to Dismiss 20.) Plaintiffs have failed, however, to allege sufficient facts to plausibly suggest that they would have net a loss under this measure. In fact, an examination of their statement indicates that after December 2002, Plaintiffs did not deposit any money into their account and only withdrew funds. (See Carlinksy Decl. Ex. H, at H-8.) It appears, then, that they continued to be positive throughout the limited period of Policy coverage.

BMIS customers to withdraw the full balance reflected on their account statements.  See In re Madoff, No. 08-01789, at 11 ("Ultimately, customer requests for payments exceeded the inflow of new investment, resulting in the Ponzi scheme's inevitable collapse.").  Therefore, although Plaintiffs may have been able to withdraw $1 million, it is speculation that they could have withdrawn the full balance of $8.5 million, and even more speculative that all of the putative class members would have been able to withdraw their full balances, as well.  More importantly, assuming that this were possible, any withdrawals in excess of their deposits would have been made with other customers' initial investments, and would now be subject to claw back under the Bankruptcy proceedings.  See id. at 23-24.  Accordingly, Plaintiffs would not have been legally entitled to this money.  See Weltover, 941 F.2d at 152.

To the extent that the Plaintiffs distinguish between loss of money and loss of securities, the preceding arguments apply equally to both.  The records of money accrued and securities owned were both entirely fictitious—"pulled from thin air."  In re Madoff, No. 08-01789, at 10.  The fact that the securities truly existed somewhere, if not in the Plaintiffs' portfolios, does not affect the analysis.  "[N]o trades were actually executed, customer funds were never exposed to the uncertainties of price fluctuation, and account statements bore no relation to the United States securities markets at any time."  Id.  Plaintiffs never actually owned these securities, and so they could not lose them either.

      **ii.  Earnings reasonably expected based on a growth assumption or an implied interest rate**

Plaintiffs' claim for earnings reasonably expected based on a growth assumption or an implied interest rate also fails.  Such loss is unambiguously the indirect result of the

Madoff scheme and, therefore, inconsistent with the plain language of the contract. See Citizens Bank, 2007 WL 4973847, at *5 (considering the income the Bank would have earned if money used in the loan fraud had been available for other uses, as well as the time value of the money, to be potential income that is an indirect loss). Lost investment opportunities may be a foreseeable result of fraud, but they are not the immediate result. In fact, the Policy's exclusions[10] expressly preclude recovery for them.

### iii. Net loss in constant dollars

Plaintiffs also argue that, when netting loss under Defendants' proposed measure, withdrawals and deposits should be adjusted for inflation. In support, they rely on the constant dollars model urged by the Securities and Exchange Commission, but not considered by the Court, in the Madoff bankruptcy liquidation case. In re Madoff, No. 08-01789 (BRL), at 5-6 & n.8. This point, however, belies a significant distinction between the bankruptcy and insurance contexts. In the former case, claims are valued relatively because there is a limited pool of assets; adjustments for inflation ensures that earlier investors are not disadvantaged. This concern is not relevant here. Moreover, the Policy provides for coverage adjustments for inflation only in limited instances, which do not apply to this case. (Carlinsky Decl. Ex. A, at A-1, A-10 to A-11.)

### iv. Non-recoverable tax payments

Plaintiff's fourth measure of recovery is for their non-recoverable tax payments, which they argue are the foreseeable and direct result of this fraud. (Mem. in Opp. to Mot. to Dismiss at 16.) The Second Amended Complaint does not specifically allege that

---

[10] Specifically, the Policy excludes recovery for "any loss that is an indirect result of any fraud guard event including but not limited to: (a) [the policyholder's] inability to realize income that [the policyholder] would have realized had there been no loss or damage to money, securities, or other property." It also disclaims "cover[age for] any guarantee of the financial performance of any financial instrument or investment vehicle." (Carlinsky Decl. Ex. A, at A-40.)

16

they made any such payments.  Although Plaintiffs note that they often withdrew funds in order to pay taxes on the gains, (Mem. in Opp. to Mot. to Dismiss at 2,) as Defendants point out, many of these tax payments may be recoverable under IRS guidelines for "theft loss."  (Reply Mem. in Supp. of Mot. to Dismiss at 6-7.)  While these adjustments may only be carried back three years and forward twenty, see Rev. Rul. 2009-09, 2009-14 I.R.B. 735, any earlier tax payments are losses that precede the date of Policy coverage.

Regardless, although these tax payments may be a foreseeable and proximate result of the fraud, see Alexsey v. Kelly, 614 N.Y.S.2d 736, 736 (N.Y. App. Div. 2d Dep't 1994), they are not the immediate result of the fraud and, therefore, are not direct losses.  As Defendants argue, it is an absurdity to allege, as Plaintiffs would have to, that Madoff perpetrated this fraud in order to induce them to pay taxes.  (Mem. in Supp. Mot. to Dismiss at 6.)  Although one can be induced to part with one thing of value (e.g., investment money), creating a fraud in which other things of value (e.g., tax money) are also lost, such other loss would not be direct.

### v. Legitimate growth on investments during the pre-Ponzi period

Plaintiffs argue that "there is some indication that BMIS did not start as a Ponzi scheme but gradually evolved into one over a period of time."  (2d Am. Complaint ¶ 36.) They seek a declaration that, since "Defendants are unable to identify the date the BMIS Ponzi scheme started, [they] cannot employ the loss methodology at issue [that is, deposits minus withdrawals] because earnings and/or withdrawals before the Ponzi scheme started were all legitimate."  (Id. ¶ 80.)  Defendants counter that this argument contradicts Plaintiffs' earlier admission that they invested years after the Ponzi scheme

began.[11]  (Mem. in Supp. Mot. to Dismiss at 3.)  Moreover, Defendants argue, Plaintiffs do not allege that they invested and earned sufficient returns during this period to overcome the $225,000 net gain on their investment.  (Mem. in Supp. Mot. to Dismiss at 13.)

Plaintiffs ask the insurance company to do the near impossible—trace the money allegedly invested during the pre-Ponzi period up until 2008, when the Policy coverage began, and then separate this portion from the rest of the wholly-fictitious funds reflected in the account.  A Ponzi scheme essentially requires that, once underway, any earnings that have legitimately accrued beforehand become swept into the fraud and cease to exist independently.  Besides the logical flaws in this argument, there are serious practical hurdles that the Plaintiffs have failed to clear.  The Defendants are correct that Plaintiffs have made no factual allegation as to how much money Madoff legitimately invested on their behalf.  Most importantly, though, the Plaintiffs have offered no factual allegation that undermines the significant evidence that this scheme began well before their first investment in 1997.  Accordingly, they have failed to meet the pleading requirements of Twombly and Iqbal.

### 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants move to dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing as foreclosed by their inability to allege a claim for breach of contract.  (Mem. in Supp. Mot. to Dismiss at 22.)  Plaintiffs argue that this claim can stand on its own as an alternative grounds for recover.  (Mem. in Opp. to Mot. to Dismiss 23.)  They are incorrect.  Under New York and California law, there is no independent

---

[11] Defendants seemingly refer to the statement in Plaintiffs' original Complaint that the fraud began at the latest by the early 1990s. (Complaint ¶¶ 3, 8, 9.)

18

claim for the breach of the covenant of good faith and fair dealing.  See, e.g., Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002); Waller, 11 Cal. 4th at 35-36 (holding that a claim of bad faith requires the existence of underlying contractual liability).  A good faith and fair dealing claim is not an insurance policy to cover instances where there is no breach of contract.  Since there is no predicate liability for breach of contract, this claim is dismissed.

### 3. Unjust Enrichment

Defendants argue that Plaintiffs' unjust enrichment claim fails as a matter of law because California does not recognize it as an independent cause of action.  (Mem. in Supp. Mot. to Dismiss at 23.)  Plaintiffs respond that a litigant may recover restitution where he or she fails to establish contract liability.  (Mem. in Opp. of Mot. to Dismiss at 23.)  To begin, if the Plaintiffs prove that they are entitled to restitution, they stand to recover the $115 paid for the Fraud SafeGuard premium, not the $30,000 coverage limit.  If you pay for insurance and the insurance company takes a valid no pay position, that is not unjust enrichment because the company did nothing improper.  See, e.g., Clark v. Superior Court, 235 P.3d 171, 176 (Cal. 2010); McGrath v. Hilding, 363 N.E.2d 328, 331 (N.Y. 1977).  Accordingly, this claim must be dismissed.

### 4. Declaratory Relief

Finally, Defendants ask the Court to dismiss Plaintiff's declaratory judgment claims as redundant and unnecessary.  (Mem. in Supp. Mot. to Dismiss at 23.)  They assert that these claims were only added to the latest Complaint in an attempt to get the class certified under the less stringent requirements of Rule 23(b)(2).  Additionally,

Defendants argue that the Plaintiffs lack standing to bring such claims because they have a fully ripe claim for damages. (Id. at 14.)

Courts have broad discretion to dismiss redundant declaratory judgment claims. See, e.g., In re Orion Pictures Corp., 4 F.3d 1095, 1100 (2d Cir. 1993). In this case, Count 4 addresses the calculation of loss under the Policy and goes to the heart of the breach of contract claim. Count 6 concerns affirmative defenses that have not yet been asserted but presumably will be in the answer and is, therefore, premature and may be redundant. As a result, this reason is sufficient to dismiss these claims.

### B. Motion to Strike Class Allegations

Since there is no claim on the merits, the motion to dismiss the complaint is granted. As there is no complaint, there can be no class action. Accordingly, the motion to strike is moot.

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED and Defendants' motion to strike is terminated as moot. The Clerk of Court is directed to enter judgment accordingly and terminate the case.

Dated: New York, New York
       September 30, 2010

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge